

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0265-07

**GERARDO FLORES, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE NINTH COURT OF APPEALS
### ANGELINA COUNTY

KELLER, P.J., delivered the opinion of the Court in which MEYERS, WOMACK, KEASLER, and HERVEY, JJ., joined. COCHRAN, J., filed a concurring opinion in which JOHNSON, J., joined. PRICE, and HOLCOMB, JJ., concurred.

### O P I N I O N

Appellant was convicted of murdering his pregnant girlfriend's twin fetuses by stepping on her abdomen, though he maintains that she also took measures to cause the deaths. Appellant raises three constitutional challenges to the capital murder statute. We hold that the statute is constitutional. In addition, appellant contends that the court of appeals erred in ruling that he was not entitled to a jury instruction on the lesser-included offense of deadly conduct. We disagree. Thus, we shall affirm the court of appeals.

## I. BACKGROUND

Appellant and his girlfriend Erica Basoria, aged 18 and 16 respectively, had been dating for over a year when Ms. Basoria discovered sometime in February 2004 that she was pregnant. An ultrasound later showed that she was carrying twins. At an April 30 appointment, Ms. Basoria told her doctor, Jerry Johnson, that she was considering an abortion.[1] Dr. Johnson informed her that the pregnancy was at such a late stage that he could not perform an abortion safely and that no local physicians performed abortions.

According to Ms. Basoria's testimony, she asked appellant to help her terminate the pregnancy by stepping on her abdomen. He did so on two occasions: two weeks and one week before the premature delivery. She had to ask him repeatedly before he agreed to step on her. According to appellant's statement to the police, he used a "slow, steady press" on her abdomen, and stopped pressing once she asked him to stop.

Ms. Basoria also testified that she took measures to induce the deaths of the fetuses. She struck herself in the abdomen more than ten times. She began engaging in this behavior two weeks before the premature delivery; by the last week of her pregnancy, she was striking herself every day. After Dr. Johnson instructed her to refrain from jogging and going on walks, she took up jogging and failed to limit her walking, in a deliberate attempt to endanger the pregnancy. Ms. Basoria further testified that she had violated her doctor's instructions to take prenatal vitamins, though her medical records showed that she had reported taking them.

On May 7, Ms. Basoria—then approximately 20 to 22 weeks pregnant—prematurely

---

[1] On the other hand, Dr. Johnson also testified that Ms. Basoria refused to have the fetuses tested for their risk of medical conditions such as Down's syndrome because she was opposed to abortion.

delivered the twins at home. They were stillborn. According to the doctor who conducted the autopsies, the cause of the deaths appeared to be some sort of "blunt force trauma" that had occurred sometime between May 4 and May 6. The twins had been dead in utero for at least one day before they were delivered.

Appellant was indicted for capital murder and murder for intentionally or knowingly causing the deaths of "unborn child #1" and "unborn child #2."[2] Appellant pled not guilty and filed a pretrial motion to dismiss the indictment on the grounds of due process, equal protection, and the Establishment Clause. The trial court denied the motion, and appellant was tried by a jury.

At trial, expert witnesses testified that either a pregnant woman striking herself repeatedly or another person stepping on a pregnant woman's abdomen could terminate a pregnancy. There was no consensus among the witnesses on whether the striking, the stepping, or some genetic abnormality caused the deaths.[3]

Dr. Johnson and others who observed Ms. Basoria shortly after the premature delivery observed bruises on her upper arms, a "small" bruise on her face, and "a line of purplish bruises" roughly three inches long across her abdomen.[4] When asked about the bruises, Ms. Basoria testified

---

[2] T EX. PEN. CODE §§ 19.02(b)(1), 19.03.

[3] For example, Dr. Steven Pulsinik, appellant's expert witness, testified that any of these three might have been the cause. On the other hand, one of the State's expert witnesses noted that it is controversial in the medical community whether a genetic abnormality poses a significant risk to a pregnancy. Dr. Tommy J. Brown, who performed the autopsies, testified that if a foot were pressed on a pregnant women's abdomen and she were striking herself in the abdomen, the deaths could be caused by either one, depending on which was exerting more force.

[4] Dr. Johnson testified about the nurses' and his own observations of Ms. Basoria on the day she was admitted to the hospital after the premature delivery:
> Q: What was the nurses' report to you about this?
> A: They were quite shocked because she had a very significant amount of

that appellant struck her in the face on the night of May 6, causing the bruise there.[5]  She also testified that the bruises on her arms resulted when she and appellant were engaging in consensual, playful roughhousing. Dr. Stephen Pustilnik, appellant's expert witness, testified that the bruise on her abdomen appeared to be "much more consistent" with the pregnant woman striking herself than with a foot being pressed down on the abdomen.  According to appellant's statement to the police and Ms. Basoria's trial testimony, he stepped above her navel, whereas the bruises on her abdomen

---

fresh bruising over her abdomen, face, arm; that she was pretty beat up.

Q: Okay.  And your—based on your observations of Ms. Basoria, what conclusions did you come to?

A: Well, my conclusion was that she had suffered a significant amount of trauma.  It did not appear to be a car wreck or anything like that.  She did not elicit who or what had done any of the bruising or damage to her or her babies.

Q: When you say "bruising and damage," what—can you describe what it is you saw?

A: Reading from my admission note under the heading, Examination: There was bruising over the right cheek bone.  Her lip was cracked.  There was blood apparent on both lips.  The lips were swollen, but I did not see any lacerations or any tears in the lips.

Both upper arms had bruising which, in my opinion, appeared to be consistent with injuries from a finger grasp around the arm.  Generally you'll see one circle that's darkly bruised and then a clear area that's not involved.  And each finger will—the person was grabbed with will cause a bruise.  And that's very characteristic.  That was present on both upper arms.

Her back and buttocks had no evidence of any trauma.  The left breast had an old bruise.  There was no new bruising evidence on the left breast.  Most of her bruising was over the abdomen and it was around the level of the umbilicus, or the belly button, from . . . side to side going all the way across the abdomen.

And that would be—remember, she was postpartum.  She had already delivered—the size of the uterus would be—that would be about the biggest bulge in where her stomach would be while the babies were inside.

Legs and feet had no . . . evidence of trauma.  There was no evidence of any kind of perineal or sexual assault present.

[5] She maintained that he had never hit her before then and that he was not physically abusive toward her.

were below her navel. Likewise, Ms. Basoria testified that she and not appellant caused those bruises.

To support the theory that Ms. Basoria wanted to have the children and was being abused by appellant, the State presented an expert witness who testified about the dynamics that are typically present in an abusive relationship. He observed that, if the abuser is arrested or charged with a crime, the abused victim will commonly defend the abuser, such as by requesting that the charges be dropped or refusing to testify against him. The State also attempted to impeach Ms. Basoria's credibility by presenting testimony of a teacher who testified that Ms. Basoria showed her the ultrasound pictures and appeared happy and excited about the prospect of having children.

The trial court submitted jury instructions on capital murder, injury to a child, and manslaughter, but denied appellant's request for an instruction on deadly conduct. The jury convicted appellant of capital murder and sentenced him to life in prison.

On direct appeal, appellant raised constitutional challenges to the statute under which he was indicted and argued that the trial court erred in denying his request for a lesser-included offense instruction. The court of appeals affirmed his conviction.

## II. ANALYSIS

### A. Due Process

In his first ground, Appellant argues that the statute is unconstitutional because it allows the State to prosecute him for killing an "unborn child."[6] Appellant claims that the statute thus contravenes the restrictions announced in *Roe v. Wade*[7] and subsequent abortion decisions of the

---

[6] TEX. PEN. CODE §§ 1.07(a)(26), 1.07(a)(38), 19.03(a)(8).

[7] *Roe v. Wade*, 410 U.S. 113 (1973).

United States Supreme Court by protecting the life of a fetus before the point of viability. We recently rejected this claim in *Lawrence v. State*,[8] and we reaffirm that holding today.

Appellant also argues in his brief that the statute is unconstitutionally overbroad. Because appellant did not raise this argument in his petition for discretionary review, it is not properly before us. We overrule appellant's first ground for review.

### B. Equal Protection

In his second ground, appellant argues that the statute's exception for pregnant women terminating their own pregnancies violates equal protection in this case by exempting Ms. Basoria from criminal prosecution while allowing him to be prosecuted.[9] This argument depends on the unusual facts of this case.[10] Because Ms. Basoria was cooperating with appellant's attempts to kill the fetuses, he argues, the statute treated the two of them differently even though they were both engaging in the same behavior. Both were attempting to cause the deaths, yet only appellant and not Ms. Basoria could be prosecuted under the statute, because she was the pregnant woman carrying the victims.

In advancing this argument, appellant ignores significant evidence that Ms. Basoria did not,

---

[8] __ S.W.3d __ (Tex. Crim. App. Nov. 21, 2007).

[9] *See* TEX. PEN. CODE § 19.06. Because appellant does not specify whether this ground is under the state or federal constitution, we will address the claim only under the U.S. Constitution. *See Black v. State*, 26 SW3d 895, 896 n.4 (Tex. Crim. App. 2000) (holding that the court should address only the federal constitutional claim if appellant offers no reason for construing the parallel state constitutional provision as conferring greater protection).

[10] We are aware of no other case from any jurisdiction in which a criminal defendant who has been convicted of killing an unborn victim challenges the conviction on the grounds that the victim's mother was complicit in the killing. No such case has been cited in the briefs or the court of appeals opinion.

in fact, consent to appellant's stepping on her abdomen. She had bruises on her abdomen, arms, and face, and her lips were swollen and bloody. Appellant admitted to hitting her in the face but argues that the other bruises had innocent explanations—namely, that the bruises on her abdomen were caused by her striking herself, and the bruises on her arms resulted from consensual roughhousing between the two. Nevertheless, a jury could reasonably credit the simpler explanation of the bruises: that all of them—not just the one on her face—resulted from abusive acts by appellant. The State supported this inference through testimony on the general tendency of the victim in an abusive relationship to try to protect the abuser from being criminally prosecuted and convicted. Finally, the State presented evidence that Ms. Basoria seemed to be looking forward to carrying the twins to term.

A reasonable jury could conclude from the above evidence that appellant's acts of stepping on her abdomen were simply abusive rather than part of a plan to which she had agreed. Given that appellant's acts might not have been consensual, the very predicate for appellant's equal protection claim—that both he and Ms. Basoria were engaging in the same behavior—need not have been found to be true by a rational trier of fact.[11] Only if the acts were consensual could appellant argue that the statute treated him and Ms. Basoria unequally by allowing the State to prosecute appellant but not Ms. Basoria for the same acts.

In short, appellant sought a pretrial dismissal of the prosecution based on a claim that, even if it had been correct on the underlying merits, could have been resolved only by evidence adduced at trial.[12] That is not the purpose of a pretrial motion such as a motion to quash the indictment;

---

[11] The jury did not make a finding on consent.

[12] We express no opinion today as to those underlying merits.

rather, its purpose is to address "those issues that can be determined before there is a trial on the general issue of the case."[13] Appellant's equal protection argument, based on his allegation that Ms. Basoria consented to the acts for which he was being prosecuted, did not present such an issue.[14] The court of appeals thus did not err in affirming the trial court's decision to deny the motion to quash the indictment on this ground. We overrule appellant's second ground for review.

## C. Establishment Clause

In his third ground, appellant argues that the provision defining an "individual" to include an "unborn child"[15] violates the Establishment Clause of the U.S. Constitution by adopting "a

---

[13] *Woods v. State*, 153 S.W.3d 413, 415 (2005).

[14] The concurring opinion maintains that raising the issue at trial serves little purpose because the trial court could have done nothing more or less than an appellate court. On the contrary, requiring appellant to have raised the issue at trial serves two important purposes. First, timely raising the issue would have given the trial court a chance to rule on it, potentially avoiding the need to burden the court system with appeals. *See Young v. State*, 826 S.W.2d 141, 149 (Tex. Crim. App. 1991) (Campbell, J., dissenting) ("[I]f the issue had been timely raised in the trial court, it could have been resolved there, and the parties and the public would have been spared the expense of an appeal.").

Second, a trial court is more capable of addressing a fact-bound claim than an appellate court. The concurring opinion itself examines the facts of this case and concludes that it is unclear whether appellant was acting in concert with Ms. Basoria or abusing her. This question would have been more usefully addressed by the jury based on its assessment of witness credibility and the like. Because appellant raised the issue only before trial and on appeal, the jury never had the opportunity to make such a finding. Even if we were to agree with appellant that the Equal Protection Clause bars a prosecution of one who acts in concert with a pregnant woman to terminate her pregnancy, the appropriate remedy would not be dismissal of the indictment, as the concurrence asserts, but a new trial in which the jury could be instructed on the question of Ms. Basoria's consent. Appellant waived this remedy by neglecting to raise the issue at trial.

In light of these considerations, we should not overturn the well-established requirement that appellant must preserve an "as applied" constitutional challenge by raising it at trial. TEX. R. APP. PROC. 33.1; *see, e.g.*, *Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995)(citing *Garcia v. State*, 887 S.W.2d 846, 861 (1994))(holding that an "as applied" due process challenge is not preserved for appeal if appellant did not raise a "specific, timely objection" at trial).

[15] TEX. PEN. CODE § 1.07(a)(26).

religious point of view over a secular one."

To determine whether a statute violates the Establishment Clause, this Court has applied the three-prong test from *Lemon v. Kurtzman*:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion.[16]

Mere consistency between a statute and religious tenets, however, does not render a statute unconstitutional.[17] Otherwise, no law against theft or murder could pass constitutional muster, because those laws are consistent with religious strictures such as the Ten Commandments.[18]

Appellant has not met his burden to override the presumption that the statute is constitutional. His argument that the statute has no secular purpose is based on the faulty assumption that only religious views could motivate the legislature to protect a fetus from being killed. While some may indeed view a fetus as a human being out of religious convictions, others may reach the same conclusion through secular reasoning or moral intuition unconnected to religion. Moreover, even those who do not view the fetus itself as a person may still want to protect fetal life simply because

---

[16] *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), *cited in Holberg v. State*, 38 S.W.3d 137, 140 (Tex. Crim. App. 2000).

[17] *Harris v. McRae*, 448 U.S. 297, 319 (1980) ("Although neither a State nor the Federal Government can constitutionally pass laws which aid one religion, aid all religions, or prefer one religion over another, it does not follow that a statute violates the Establishment Clause because it happens to coincide or harmonize with the tenets of some or all religions." (citations omitted)); *Holberg v. State*, 38 S.W.3d 137, 140 (Tex. Crim. App. 2000)("[T]he mere fact that the statutes are consistent with the tenets of a particular faith does not render the statutes in violation of the Establishment Clause.").

[18] *See McRae*, 448 U.S. at 319.

it represents *potential* human life.[19]

Applicant has similarly failed to show that the statute violates either of the remaining prongs of the *Lemon* test. He states in the abstract that the statute's effect is to advance religion, but he fails to specify how it is that the statute does so. Finally, the statute does not entangle government with religion merely by evincing a respect for fetal life that might find approval among many religious adherents. For these reasons, we overrule appellant's third ground for review.

### D. Lesser-Included Offense

In his fourth ground, appellant contends that the trial court erred in refusing to charge the jury on the lesser-included offense of deadly conduct. The court of appeals held that no error occurred because there was no evidence that appellant "failed to perceive the risk involved in his conduct."[20]

A defendant is entitled to a jury charge on a lesser-included offense if two requirements are met. First, the defendant must request an instruction on a lesser-included offense of the charged offense under Article 37.09 of the Texas Code of Criminal Procedure.[21] Second, there must be "some evidence" that, if the defendant is guilty, he is guilty only of the lesser-included offense.[22] Unlike the second step, the first step in this analysis is a pure question of law and does not depend

---

[19] *See Roe*, 410 U.S. at 150 ("Logically, of course, a legitimate state interest in this area need not stand or fall on acceptance of the belief that life begins at conception or at some other point prior to live birth. In assessing the State's interest, recognition may be given to the less rigid claim that as long as at least potential life is involved, the State may assert interests beyond the protection of the pregnant woman alone.").

[20] *Flores v. State*, 215 S.W.3d 520 (Tex. App. - Beaumont 2007)(citing *Stadt v. State*, 182 S.W.3d 360, 364 (Tex. Crim. App. 2005)).

[21] *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993)(citing *Royster v. State*, 622 S.W.2d 442 (Tex. Crim. App. 1981)(opinion on rehearing)).

[22] *Rosseau*, 855 S.W.2d at 672 (citing *Royster*, 622 S.W.2d 442).

on evidence presented at trial.[23]

A defendant does not satisfy the second prong of the *Royster/Rousseau* test if there is evidence that he committed an offense that is a lesser-included of the charged offense but greater than the requested lesser-included offense.[24] For instance, in *Jackson v. State*, the defendant was charged with capital murder and requested a jury charge on the lesser-included offense of aggravated assault by recklessly causing serious bodily injury.[25] The evidence clearly showed that the defendant had caused not merely serious bodily injury but death; the only pertinent factual dispute was whether he had acted recklessly or intentionally.[26] Noting that he might have been entitled to an instruction on the lesser-included offense of manslaughter based on the evidence that he recklessly caused *death*, we held that he was not entitled to an instruction on aggravated assault for recklessly causing mere serious bodily injury.[27]

The same principle compelled our holding in *Thomas v. State*.[28] Having been charged with murder, the defendant in that case presented evidence of recklessness that might have supported an instruction on the lesser-included offense of involuntary manslaughter.[29] Yet the defendant instead requested an instruction on the other lesser-included offense of criminally negligent homicide, which

---

[23] *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007).

[24] *Jackson v. State*, 992 S.W.2d 469, 474-75 (Tex. Crim. App. 1999); *Thomas v. State*, 699 S.W.2d 845, 845-52 (Tex. Crim. App. 1985).

[25] 992 S.W. 2d at 471, 474.

[26] *Id.* at 475.

[27] *Id.*

[28] 699 S.W.2d 845.

[29] *Id.* at 847.

differs from involuntary manslaughter only in requiring a negligent rather than reckless mental state.[30] We held that the defendant was not entitled to the requested instruction because the evidence relied on raised not mere negligence but recklessness.[31] The analyses in *Thomas* and *Jackson* make clear that a defendant is not entitled to a jury instruction on a lesser-included offense if the evidence on which the defendant is relying raises another offense that "lies between" the requested and charged offenses.[32]

Applying the first prong of the *Royster/Rousseau* test to this case, we must determine whether the offense for which appellant requested an instruction, deadly conduct, is a lesser-included offense of the charged offense, capital murder. We have held that deadly conduct is a lesser-included offense of attempted murder.[33] Attempted murder is a lesser- included offense of capital murder.[34] Therefore, deadly conduct is a lesser-included offense of capital murder.

In addition to being consistent with our caselaw, this conclusion is supported by a comparison of the elements of the two offenses. Deadly conduct differs from capital murder in both its culpable mental state and its result. For each of these elements, the offense of deadly conduct would be "established by proof of the same or less than all the facts required to establish the commission of" capital murder, thus constituting a lesser-included offense under Article 37.09 of

---

[30] *Id.* at 849.

[31] *Id.* at 852.

[32] *Jackson*, 992 S.W. 2d at 475.

[33] *Guzman v. State*, 188 S.W.3d 185, 190 (Tex. Crim. App. 2006).

[34] *See* TEX. CODE CRIM. PROC. art. 37.09(4) ("An offense is a lesser included offense if . . . it consists of an attempt to commit the offense charged or an otherwise included offense.").

the Texas Code of Criminal Procedure.[35]

First, deadly conduct requires a reckless mental state, whereas capital murder requires knowledge or intent. Intent is a higher degree of culpability than recklessness.[36] The Texas Penal Code states, "Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged."[37] Therefore, proof of intent would, as a matter of law, establish recklessness as well.

Second, the result required for deadly conduct is "plac[ing] another in imminent danger of serious bodily injury,"[38] whereas the result required for capital murder is "caus[ing] the death of an individual."[39] Any proof that would have established that appellant had caused the deaths of the fetuses would have also established, *a fortiori*, that he had placed them in imminent danger of serious bodily injury. Because a comparison of the elements of the two offenses, as well as our caselaw, demonstrates that deadly conduct is a lesser-included offense of capital murder, appellant has satisfied the first of the two prongs of the *Royster/Rousseau* test.

The next step in this analysis is to determine whether there is some evidence that, if appellant is guilty, he is guilty only of deadly conduct, and not capital murder.[40] Appellant argues that he meets this requirement because there was evidence that he did not cause the twins' deaths.

---

[35] *Id.* art. 37.09(1).

[36] TEX. PEN. CODE § 6.02(d).

[37] *Id.* § 6.02(e).

[38] *Id.* § 22.05(a).

[39] *Id.* § 19.02(b)(1).

[40] *Stadt*, 182 S.W.3d at 363.

Appellant is correct that there was some evidence that the deaths were actually caused by their own mother. Ms. Basoria testified that she repeatedly struck herself in the abdomen, and expert witnesses testified that these blows might have caused the deaths. Moreover, the autopsy showing that the cause of deaths occurred one to three days before the premature delivery supported the defense's theory that the deaths were caused by her striking herself (which she claimed to have done every day during the last week of the pregnancy) rather than by his stepping on her (which she claimed he last did one week before the premature delivery). Also, there was testimony that the deaths could have been caused by a genetic disease.

This evidence could have convinced a rational jury that appellant did not cause the deaths but merely intended to do so. Yet appellant has not presented any evidence that he acted merely recklessly rather than intentionally. Indeed, appellant's own statement to the police and Ms. Basoria's testimony indicate that he committed the acts in question in a conscious attempt to end the lives of the fetuses. By marshaling evidence that he might not have caused the deaths, without disputing the evidence that he acted intentionally, appellant might have raised, and been entitled to, an instruction on an offense that lies between the requested and charged offenses—namely, attempted murder.[41] Deadly conduct differs from attempted murder only in requiring a reckless rather than intentional mental state. Because appellant has presented no evidence that his acts were reckless rather than intentional, there is no evidence raising deadly conduct.

While appellant has satisfied the first prong of the *Royster/Rousseau* test, he has failed to satisfy the second prong because he has not presented some evidence that, if he is guilty, he is guilty

---

[41] Deadly conduct is a lesser-included offense of attempted murder, *see Guzman*, 188 S.W.3d at 190, which is, in turn, a lesser-included offense of capital murder, *see* TEX. CODE CRIM. PROC. art. 37.09(1), (4). Appellant did not request a jury instruction on attempted murder.

only of the requested lesser-included offense of deadly conduct. Appellant was thus not entitled to an instruction on deadly conduct.

In light of this analysis, we conclude that the court of appeals did not err in holding that the trial court did not err in refusing to instruct the jury on deadly conduct. Consequently, we overrule appellant's fourth ground for review.

### III. CONCLUSION

We affirm the judgment of the court of appeals.

Filed: February 13, 2008
Publish