Opinion issued April 10, 2008












In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00975-CR






HOWARD JOSEPH HOLMES, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 208th District Court

Harris County, Texas

Trial Court Cause No. 1051573






MEMORANDUM OPINION

 A jury found appellant, Howard Joseph Holmes, guilty of the offense of capital
murder. See Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(7)(A) (Vernon 2003
& Vernon Supp. 2007). The State did not seek the death penalty, and the trial court
assessed punishment at life imprisonment without parole. Appellant raises four issues
on appeal: (1) the Penal Code definition of an "individual" as including an unborn
child violates the Establishment Clause of the United States Constitution; (2) the
Penal Code definitions of an "individual" as including an unborn child and "death"
to include the failure of an unborn child to be born alive violates the Eighth
Amendment to the United States Constitution; (3) the evidence was factually
insufficient to prove that appellant knew his conduct was reasonably certain to
prevent his pregnant wife's unborn child from being born alive; and (4) the trial court
erred by denying appellant's requested jury charge on voluntary conduct.

 We affirm.

 Background


 Just after midnight on December 28, 2005, Sherry Arnold, who was married to
appellant and was about 20 weeks pregnant, called 9-1-1. Although Arnold was
unable to ask for help, the line remained open and recorded an altercation between
Arnold and appellant. On the audiotape recording, Arnold repeatedly pleaded with
appellant saying, "Let me go," and "Stop it, Howard." Appellant repeatedly shouted
at Arnold to "Shut up" and said, "You don't listen to me," and "You're dead." After
what sounded like a hit or a slap, Arnold cried, "Ow . . . I'm listening. Stop it
Howard. You said no violence tonight. You promised. Please, no more." Appellant
responded, "I'll leave you alone when you shut up . . . ." Then a gunshot is heard. 
After the gunshot, appellant is heard saying, "Sherry! No, please! Sherry!" over and
over again.

 Harris County Sheriff's Deputy Robert Sanchez was dispatched to the house
based on this 9-1-1 call. When he arrived, appellant met him at the door. Appellant's
hands and face were covered in blood. (1) Appellant led Sanchez to the master
bedroom, where Arnold lay bleeding from the top of her head and from a wound to
her upper left cheek. Sanchez testified that he heard Arnold "gurgling" when he
arrived. Appellant attempted cardiopulmonary resuscitation on Arnold until the
paramedics arrived. He told Deputy Sanchez that Arnold was three months pregnant
and asked for help. While in the master bedroom, Sanchez noticed a gun on the bed,
which he moved to the floor, out of appellant's reach.

 After the paramedics and another sheriff's deputy arrived, Sanchez led
appellant into the living room, where appellant sat on the floor talking to Sanchez
about what had happened. Deputy Sanchez testified that appellant seemed coherent
and was able to communicate and answer questions but that his behavior was
consistent with someone being in shock. Sanchez put bags over appellant's hands,
and Deputy Glover later took samples for gunshot residue testing.

 Appellant consented in writing to a search of his house and was handcuffed and
placed in the back of a patrol car. While searching the house, Deputy Roy Glover,
a crime scene investigator, found a fragment of a bullet in a wall between the living
room and the kitchen, behind a storage cabinet. Glover testified that it appeared that
the bullet had passed through the storage cabinet before striking the wall. He found
a spent shell casing in a trash can in the kitchen. In the master bedroom, Glover saw
blood smeared on the light switch and on the bed, the pillow, the telephone, the carpet
beside the bed, the night stand, and the desk area. He found a bullet with hair fibers
beneath a pillow on the bed, a spent shell casing, and the automatic handgun that
Deputy Sanchez moved from the bed to the floor earlier. The handgun had one bullet
in the chamber and two in the magazine.

 Deputy Sanchez took appellant to the Harris County Sheriff's Office Homicide
Division, where appellant met with Detective Tracy Shipley. Shipley advised
appellant of his Miranda rights, which he waived. (2)
 She took a statement from him,
which he read and corrected. In his statement, appellant said:

 I am giving this statement to Detective Shipley at her request regarding
the shooting of my wife. I was at home today and my wife and I began
arguing. I rented some movies and bought some rum and Coke at a
liquor store near my house. I was going to watch some movies and have
a few drinks since I was not working and just have some quiet time. My
wife, Sherry Arnold, has a lot of credit card debt and we were arguing
about her getting a job and paying off some of the debt. Sherry is a
pharmacist technician and we are both in the army reserves together. 
Sherry has about forty-five thousand dollars in credit card debt and I
told her I was not going to pay it off. 


 About 5:00 PM she left the house and said she was not coming back
tonight. Sherry was mad at me for something I said which is she has no
job skills. I told her she couldn't get a job with the skills she has and
she should go back to school to get more skills. She was gone for about
four hours and she came home about 9:00 or 9:30 PM. I had locked the
door because I thought she wasn't coming back. I guess she just drove
around for a couple of hours. All she took was her car keys and wallet. 
When she came home she said we needed to talk but I didn't want to
talk. I turned the TV off at some point and I guess she thought that
meant I was ready to talk but I still didn't want to talk. I told her I was
ready to play a video game and she wanted to be left alone. Sherry
wanted me to go back to work because I was off for five days.


 I told her we needed to start selling some of the stuff we had to get rid
of our debt. Sherry's father and grandfather died and willed her some
guns. I got one of the guns to start cleaning it so we could sell it. The
gun is usually kept at the headboard of the bed on my side. I thought it
was unloaded but it went off when I was in the living room. A round
popped off. I thought the clip and gun were empty until it went off.


 I was trying to get back to the bedroom to put the gun up when Sherry
told me to give her the gun so she could unload it and clear it. I told her
I could do it and when we were in the bedroom I backhanded her with
my left hand, which was holding the gun, and it went off. My finger
was on the trigger guard not the trigger. I didn't mean to backhand her
and swung at her to make her get away from me. I didn't know she was
that close. My right hand is my usually strong hand.


 Detective Shipley asked me if I threatened Sherry. I did not threaten
Sherry. I threatened to leave and threatened myself but I didn't threaten
Sherry. Detective Shipley asked me if there was any physical
confrontation between me and Sherry. I pushed her away because she
was being clingy, telling me "Don't go" and things like that. I had
gotten some of my clothes out of the closet to take with me when I left
and laid them on the foot of the bed on my side.


 Meanwhile, the paramedics attempted CPR and then took Arnold to the
emergency room. Deputy Chester Smith went to the hospital and collected samples
from Arnold's hands for gunshot residue testing. Arnold was pronounced dead
shortly after 1:00 a.m. Marissa Feeney, a Harris County medical examiner, testified
that Arnold had been 20-21 weeks pregnant. She said that when maternal circulation
ceased, a fetus at that stage of gestation would no longer get oxygen and nutrients
from the mother and would die. She said Anrold's unborn child could not have
survived because "a fetus at that gestational age is considered too young to be viable
outside the mother's womb."

 Feeney also testified that in addition to the gunshot wound, Arnold had bruises
on her nose, chest, and shoulders. Feeney said that although bruising from CPR is not
unusual, some of the bruises appeared old and some appeared new. Feeney said that
there was no gunshot residue or stippling on or around the gunshot wound. James
Jackson, a forensic chemist, testified that the samples taken from Arnold's right hand
palm, and back and palm of her left hand were consistent with being in close
proximity of a firearm during discharge.

 Deputy Bradley Bruns, who works for the Harris County Sheriff's
Department's Regional Firearms Lab, testified that the weapon used in the shooting
was an AMT brand, .45 caliber, semi-automatic pistol. He testified that he fired the
gun three times, and it was working properly. He said that for this gun to go off twice
accidentally, the shooter's finger would have to be on the trigger, not the trigger
guard, and the safety would have to be down. He said that in general, stippling would
be present around a gunshot wound if a victim were shot from close range, but it
would not be present if the victim were shot from farther away. Finally, he said that,
normally, a person would make sure a gun was not loaded before cleaning it.

 Lastly, James Holmes, appellant's brother, testified for the defense. He said
that he had heard the 9-1-1 tape and his brother sounded intoxicated. He also testified
that appellant had been a military nurse and spent twenty or thirty years--most of his
adult life--in the military. Finally, he testified that he and the rest of the family knew
that Arnold was pregnant.

 At the charge conference, appellant requested the following instruction
regarding voluntary conduct be included in the court's charge.

 A person commits an offense only if he voluntarily engages in the
conduct including an act or omission. However, conduct is not rendered
involuntary merely because the person does not intend the results of his
conduct. Therefore, if you believe from the evidence beyond a
reasonable doubt that on the occasion in question the defendant, Howard
Joseph Holmes, did cause the death of Sherry Holmes [sic] by shooting
her with a gun, as alleged in the indictment, but you further find from
the evidence or have a reasonable doubt, thereof, that the shooting was
the result of an accidental discharge of the gun and was not the
voluntary act or conduct of the defendant, you will acquit the defendant
and say by your verdict not guilty.


The trial court denied his requested instruction. 


Establishment Clause
 

 In his first issue, appellant argues that the Penal Code definition of an
individual as "a human being who is alive, including an unborn child at every stage
of gestation from fertilization to birth" violates the Establishment Clause of the
United States Constitution. Tex. Penal Code Ann. § 1.07(a)(26) (Vernon Supp.
2007). The Court of Criminal Appeals recently held that it does not. Flores v. State,
245 S.W.3d 432, 441 (Tex. Crim. App. 2008). We overrule appellant's first issue.

Eighth Amendment

 In his second issue, appellant asserts that "expanding the former Penal Code
definition of an 'individual' as 'a human being who has been born and is alive,' to
include 'an unborn child at every stage of gestation from fertilization until birth' and
adding a corresponding definition of 'death' that 'includes, for an individual who is
an unborn child, the failure to be born alive' violates the Eighth Amendment to the
United States Constitution because it expands those cases which can be prosecuted
for capital murder in an arbitrary and capricious manner."

 The Eighth Amendment provides, "Excessive bail shall not be required, nor
excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const.
amend. VIII. When we consider the constitutionality of a statute, we begin with the
presumption that the legislature has not acted unconstitutionally. Lawrence v. State,
240 S.W.3d 912, 915 (Tex. Crim. App. 2007); also Tex. Gov't Code Ann. §
311.021(1) (Vernon 2005). The party challenging the constitutionality of the statute
bears the burden of establishing its unconstitutionality. Rodriguez v. State, 93 S.W.3d
60, 69 (Tex. Crim. App. 2002). In addition, he must show that it is unconstitutional
as applied to him, not as to others. Vuong v. State, 830 S.W.2d 929, 941 (Tex. Crim.
App. 1992).

 The legislature is vested with the power to define crimes and prescribe
penalties. Willis v. State, 192 S.W.3d 585, 596 (Tex. App.--Tyler 2006, pet. ref'd). 
A person commits capital murder if he intentionally or knowingly causes the death
of "more than one person . . . during the same criminal transaction." Tex. Penal
Code Ann. §§ 19.02(b)(1), 19.03(a)(7)(A). A "person" includes an "individual." Id.
§ 1.07(a)(38) (Vernon Supp. 2007). An "individual" is "a human being who is alive,
including an unborn child at every stage of gestation from fertilization until birth." 
Id. § 1.07(a)(26). Therefore, a person who intentionally or knowingly causes the
death of a woman and her unborn child, at any stage of gestation, commits capital
murder. Lawrence, 240 S.W.3d at 915. The statute exempts conduct committed by
a woman who chooses to terminate her own pregnancy or a health care provider
performing an abortion on a consenting patient. Id.; Tex. Penal Code Ann. § 19.06
(Vernon Supp. 2007). The Court of Criminal Appeals has previously rejected an
Eighth Amendment challenge to the statute defining capital murder as the murder of
more than one person in the same criminal transaction, holding that the statute did not
fail to sufficiently narrow the class of persons subject to the death penalty. Vuong,
830 S.W.2d at 941.

 Appellant challenges the statute based on the potential imposition of the death
penalty. The State did not seek the death penalty. Appellant does not challenge his
sentence. He has not shown that the challenged sections of the Penal Code are
unconstitutional or unconstitutional as applied to him. We overrule his second issue.

Factual Sufficiency

 In his third issue, appellant argues that the evidence was factually insufficient
to prove that he acted with actual awareness that his conduct was reasonably certain
to cause his wife's unborn child to fail to be born alive. In particular, appellant
asserts that the State did not introduce evidence relating specifically to Arnold's
unborn child.

 Sufficiency of the evidence should be measured by the elements of the offense
as defined by the hypothetically correct jury charge for the case. Malik v. State, 953
S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would be one that
accurately sets out the law, is authorized by the indictment, does not unnecessarily
increase the State's burden of proof or unnecessarily restrict the State's theories of
liability, and adequately describes the particular offense for which the defendant was
tried. Id.

 When conducting a factual-sufficiency review, we view all of the evidence in
a neutral light. Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). We will
set the verdict aside only if (1) the evidence is so weak that the verdict is clearly
wrong and manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000). Under the first prong of Johnson, we cannot conclude that a conviction is
"clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence
admitted, we would have voted to acquit had we been on the jury. Watson v. State,
204 S.W.3d 404, 417 (Tex. Crim. App. 2006).

 Under the second prong of Johnson, we cannot declare that a conflict in the
evidence justifies a new trial simply because we disagree with the jury's resolution
of that conflict. Id. Before finding that evidence is factually insufficient to support
a verdict under the second prong of Johnson, we must be able to say, with some
objective basis in the record, that the great weight and preponderance of the evidence
contradicts the jury's verdict. Id. In conducting a factual-sufficiency review, we
must also discuss the evidence that, according to appellant, most undermines the
jury's verdict. See Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

 We may not re-weigh the evidence and substitute our judgment for that of the
fact-finder. King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The
fact-finder alone determines what weight to place on contradictory testimonial
evidence because that determination depends on the fact-finder's evaluation of
credibility and demeanor. Cain, 958 S.W.2d at 408-09. As the determiner of the
credibility of the witnesses, the fact-finder may choose to believe all, some, or none
of the testimony presented. Id. at 407 n.5. The standard for reviewing the factual
sufficiency of the evidence is whether, after considering all of the evidence in a
neutral light, the jury was rationally justified in finding guilt beyond reasonable
doubt. Watson v. State, 204 S.W.3d 404, 415 (Tex. Crim. App. 2006).

 As charged in the indictment, the State was required to prove that on or about
December 28, 2005, appellant intentionally or knowingly caused the deaths of both
Sherry Arnold and her unborn child by shooting Sherry Arnold with a firearm. See
Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(7)(A). Appellant specifically
argues that the State did not prove beyond a reasonable doubt that appellant actually
knew that shooting Arnold would cause the death of her unborn child. 

 On the night of the shooting, appellant stated more than once that Arnold was
pregnant, specifically three-months pregnant. In addition, appellant's brother
testified that he and the rest of the family knew Arnold was pregnant. Appellant's
brother further testified appellant had been a military nurse for twenty or thirty years. 
The medical examiner testified that Arnold was 20-21 weeks pregnant and that a fetus
at that gestational age could not survive outside the womb. Specifically, the
prosecutor asked, "At the age that you observed the fetus to be at the time of autopsy,
would there have been any way that, that child could have been--could have been,
I guess, taken from the mother and survived? Would it have been at a viable point?" 
Feeney responded, "That gestational age is considered too young to be viable outside
the mother's womb." By referring to the autopsy and "that child," the prosecutor and,
therefore, Feeney, were referring to Arnold's unborn child, not a hypothetical unborn
child.

 After considering all of the evidence in a neutral light, we conclude that the
jury was rationally justified in finding beyond reasonable doubt that appellant
actually knew that shooting Arnold would cause the death of her unborn child. See
Watson v. State, 204 S.W.3d 404, 415 (Tex. Crim. App. 2006). We overrule
appellant's third issue.

Charge Error

 In his fourth issue, appellant complains that the trial court reversibly erred by
denying his requested charge on voluntary conduct. Appellant contends that he did
not voluntarily shoot his pregnant wife, but rather that the gun accidentally fired
when he "backhanded" her. 

 Involuntary conduct is a defense to prosecution. Trujillo v. State, 227 S.W.3d
164, 169-70 (Tex. App.--Houston [1st Dist.] 2006, pet. ref'd); see Tex. Penal Code
Ann. § 6.01(a) (Vernon 2003) ("A person commits an offense only if he voluntarily
engages in conduct, including an act, an omission, or possession."). A defendant is
entitled to an instruction regarding the voluntariness of his actions when he timely
requests an instruction on the issue and it is raised by the evidence. Brown v. State,
955 S.W.2d 276, 278-79 (Tex. Crim. App. 1997). "Voluntariness," refers only to
one's physical bodily movements. Rogers v. State, 105 S.W.3d 630, 638 (Tex. Crim.
App. 2003). "If those physical movements are the nonvolitional result of someone
else's act, are set in motion by some independent non-human force, are caused by a
physical reflex or convulsion, or are the product of unconsciousness, hypnosis or
other nonvolitional impetus, that movement is not voluntary." Id. The issue of
voluntariness of one's conduct, or bodily movements, is separate from the issue of
one's mental state. Adanandus v. State, 866 S.W.2d 210, 230 (Tex. Crim. App.
1993). But "involuntary act" is not the same defensive theory as "accident." Rogers,
105 S.W.3d at 639.

 In his statement appellant said, "I back-handed her with my left hand, which
was holding the gun and it went off . . . I didn't mean to back-hand her, and swung
at her to make her get away from me." The voluntariness of his actions was not
raised by his statement to police or any other evidence. His statement raised only the
question of his intent. The court did not err in denying his requested jury instruction. 
We overrule appellant's fourth issue.








Conclusion

 We affirm the judgment of the trial court.





 Sam Nuchia

 Justice


Panel consists of Justices Nuchia, Hanks, and Higley.


Do not publish. Tex. R. App. P. 47.2(b). 
1. Deputy Glover testified that the blood on appellant was consistent with appellant having
given Arnold CPR after the shooting.
2. See Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 1630, 16 L. Ed.2d 694
(1966).