

# IN THE
# TENTH COURT OF APPEALS

## No. 10-14-00234-CR

**FILEMON HERRERA,**

                                        **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                        **Appellee**

**From the 361st District Court**
**Brazos County, Texas**
**Trial Court No. 12-04824-CRF-361**

## MEMORANDUM  OPINION

Appellant Filemon Herrera was charged with continuous sexual abuse of a child under the age of fourteen.  The indictment alleged that, between August 1, 2011, and July 9, 2012, Herrera committed two or more acts of sexual abuse against M.R., namely: aggravated sexual assault of M.R. by performing oral sex on her and aggravated sexual assault of M.R. by causing her to perform oral sex on him.  The jury convicted Herrera and assessed his punishment at forty-five years' imprisonment.  This appeal ensued.

Because Herrera does not challenge the sufficiency of the evidence, we will only briefly recite the background of the offense. M.R.'s maternal grandmother testified that seven-year-old M.R. told her that Herrera, M.R.'s paternal step-grandfather, had kissed her, improperly touched her, performed oral sex on her, and had her perform oral sex on him. M.R. told her that these things happened on different occasions at Herrera's and her paternal grandmother Rosie's house and in a shed behind their house. M.R., who was nine years old at the time of trial, also testified that, when she was in the first grade, Herrera kissed her on her mouth with his tongue, touched her private part with his hands, performed oral sex on her, and made her perform oral sex on him. These things happened on different occasions at her paternal grandmother Rosie's house and in the garage. Herrera told her that if she told anyone, he would spank her. She told her brother but asked him not to tell anyone. She eventually told her maternal grandmother.

Rosie, who was married to Herrera at the time of the offense,[1] testified that she learned of M.R.'s allegations on a Saturday but did not report it right away. The following Monday, she used Herrera's debit card to remove $10,000 from a savings account. She stated that she feared that Herrera would leave the country. She then called CPS to report M.R.'s allegations. Rosie also confronted Herrera and told him that he had to leave the home because of what he had done to M.R. She stated that Herrera said nothing; he picked up his things and left the house. Herrera subsequently called her and said that nothing serious had happened, that she should just let it go, and that if she

---

[1] Herrera and Rosie had divorced at the time of trial.

would just stop thinking and talking about it, she could get over it faster. When asked by the prosecutor if she told M.R. to make the allegations to get Herrera's money, she replied, "No."

M.R.'s brother J.R., who was eleven years old at the time of trial, testified that on one occasion when he was using the computer in Herrera's daughter Lisset's room, he saw Herrera and M.R. in Herrera's room together. Herrera was touching and rubbing M.R. on the legs "in and out of her pants" and was kissing her on the neck. J.R. thought Herrera caught him watching because Herrera walked up to him and said that if he told his mom or dad, Herrera would give him a spanking. J.R. stated that at another time, he was coming out of the restroom when he saw Herrera lifting up M.R.'s shirt.

Nurse Jane Riley testified that she conducted an examination of M.R. on July 23, 2012. M.R.'s mother was with her. Nurse Riley did not observe any physical signs of injury, but M.R. described to her how Herrera had sexually abused her. Nurse Riley stated that the physical and behavioral symptoms described by M.R.'s mother were also consistent with examinations of other children who had been sexually assaulted.

Herrera's daughter Lisset testified for the defense that, during the time of the alleged offense, she was living at Herrera's and Rosie's house. She said that a person could see only the corner of Herrera's bed from the computer desk where J.R. had been seated when he allegedly saw Herrera and M.R. together in Herrera's room because the door to Herrera's room could only be opened partially. She described the relationship between Rosie and M.R. during that time as "very close, attached at the hip even." She

described the relationship between Herrera and M.R. as like any granddaughter/grandfather relationship.

Lisset testified that, on July 9, 2012, she had a conversation via email with Rosie about needing tuition for her classes. Lisset described it as a "bad conversation" because it made Rosie angry that she wanted her father's money for school. Later that day, Lisset had a conversation with Rosie at Herrera's and Rosie's house. Rosie said that she was asking Herrera to leave because there were allegations being made about him. Lisset's reaction was that it was not true, and she was "disgusted at the fact that someone had ever said that about my dad." While Rosie packed Herrera's things, Lisset called Herrera and told him to come home. Lisset met Herrera outside and told him to just go inside, grab his things, and leave without talking to Rosie. Herrera did respond, however, when Rosie said something to him. Herrera was disgusted. Lisset asked Rosie about the money that Rosie took from her dad. Lisset told her dad that he needed to get his things "because it was obvious that the money was what was going on there. She was concerned about money with him."

As a rebuttal witness, L.R., Rosie's daughter and M.R.'s aunt, testified that Herrera first came to live with her and her mother, his girlfriend at the time, when she was fourteen years old. During that time, Herrera engaged in sexually inappropriate behavior with her. Herrera came up behind her and started kissing her neck and ear, pressing his body up against her, and touching her breasts over her clothes. On one occasion, she was lying down in the master bedroom talking on the phone when Herrera came in and began kissing her, forcing his tongue into her mouth, and touching her

breasts and vagina over her clothes. L.R. testified that these things happened often. She told her mother that she did not like the way that Herrera was kissing her. She did not tell her mother the full extent of what Herrera was doing to her because she was scared that Herrera would be angry with her and because she was ashamed. After she told her mother, Herrera was not allowed to be alone with her anywhere in the house, and it stopped.

### Issue One

In his first issue, Herrera contends that the trial court's admission of extraneous-offense evidence deprived him of his right to a fair trial and due process. More specifically, Herrera asserts that (1) Article 38.37, Section 2(b) of the Code of Criminal Procedure is facially unconstitutional because it deprives a defendant of a right to a fair trial and due process and (2) the admission of extraneous-offense evidence under Article 38.37, Section 2(b) in this case therefore requires reversal of his conviction. The State responds that Herrera's constitutional challenge was not preserved for review because Herrera did not raise it in the trial court.

Constitutional challenges to a statute are generally forfeited by failure to object at trial. *Curry v. State*, 910 S.W.2d 490, 496 & n.2 (Tex. Crim. App. 1995); *see also Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004). The constitutionality of a statute as applied must be raised in the trial court to preserve error. *Curry*, 910 S.W.2d at 496; *see Flores v. State*, 245 S.W.3d 432, 437 n.14 (Tex. Crim. App. 2008) (noting the "well-established requirement that appellant must preserve an 'as applied' constitutional challenge by raising it at trial"). Further, a defendant may not raise a facial challenge to

the constitutionality of a statute for the first time on appeal. *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009).

Herrera acknowledges that he made no objection to the constitutionality of Article 38.37, Section 2(b) in the trial court. He nevertheless asserts that his facial challenge may be raised for the first time on appeal based on the Court of Criminal Appeals' opinion in *Smith v. State*, 463 S.W.3d 890 (Tex. Crim. App. 2015). In *Smith*, the appellant raised for the first time in a petition for discretionary review that his conviction was void because the court held in another case that the statutory subsection under which he was convicted was facially unconstitutional. *Id.* at 892-93. The State argued that the appellant's issue was not preserved for review. *Id.* at 893-94. The court, however, rejected the State's argument and concluded that the appellant was entitled to relief, stating that "[a]ny defendant, convicted or not, may obtain relief from a conviction under a statute that has already been held void." *Id.* at 895-96. But the court in *Smith* did not overrule *Karenev*; rather, it distinguished it. *Id.* at 896. The court explained that the appellant in *Smith* was seeking relief for a conviction of a non-crime under a statute that had already been held to be invalid, while *Karenev* held that a defendant may not raise for the first time on appeal a facial challenge to the constitutionality of a statute that has not yet been declared void. *Id.*

Here, Herrera is not seeking relief for a conviction of a non-crime under a statute that has already been held to be invalid. Accordingly, *Smith* is distinguishable from this case. Instead, Herrera has raised for the first time on appeal a facial challenge to the constitutionality of a valid statute that has not yet been declared void. Accordingly,

*Karenev* is controlling. Herrera's constitutional challenge is therefore not preserved for review. *See Karenev*, 281 S.W.3d at 434. We overrule Herrera's first issue.

**Issue Two**

In his second issue, Herrera contends that the trial court erred in admitting extraneous-offense evidence in violation of Rule 403. We review the trial court's ruling on a Rule 403 objection for an abuse of discretion. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

Rule 403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. When a trial court balances the probative value of the evidence against its danger of unfair prejudice, a presumption exists that the evidence will be more probative than prejudicial. *Montgomery*, 810 S.W.2d at 389.

> [A] trial court, when undertaking a Rule 403 analysis, must balance (1) the inherent probative force of the proffered evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. Of course, these factors may well blend together in practice.

*Newton v. State*, 301 S.W.3d 315, 319 (Tex. App.—Waco 2009, pet. ref'd) (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006) (footnote omitted)).

*Probative force of the evidence*: The State argues that the probative value of L.R.'s

testimony was great. The State asserts that the evidence established Herrera's preference for young girls with whom he had frequent unsupervised contact, his method of isolating them during the encounters, and his preferred style of sexual conduct. The State contends that this was in turn probative of Herrera's character, *see* TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2(b) (West Supp. 2015), the intentionality of his conduct, and as rebuttal to his defensive theory of fabrication and financial incentive. Herrera argues that the minimal degree of similarity between the two offenses and the remoteness of the extraneous offense significantly lessened its probative value.

First, Herrera notes that to be admissible for rebuttal of a fabrication defense, "the extraneous misconduct must be at least similar to the charged one." *Newton*, 301 S.W.3d at 317 (quoting *Wheeler v. State*, 67 S.W.3d 879, 887 n.22 (Tex. Crim. App. 2002)). And Herrera asserts that there are a "myriad of differences" between the charged conduct in this case and the extraneous offense. Herrera points out that M.R. was seven years old at the time of the alleged offense while L.R. was fourteen years old, that the charged conduct constituted sexual assault while the extraneous conduct constituted indecency with a child, and that M.R. was allegedly told that she would be punished if she told while L.R. was not threatened. We believe, however, that the extraneous-offense evidence was sufficiently similar to the charged offense to have probative value. The alleged victims were the daughter and granddaughter of Herrera's wife when each was a young girl in the home.

Herrera next argues that the remoteness of the extraneous offense, which allegedly took place nineteen years before trial, also lessened its probative value. The remoteness

of an extraneous offense does impact its probative value. *Id.* at 318. We believe, however, that, given the similarity of the offenses, this factor weighs in favor of admissibility.

*Proponent's need for that evidence*: Herrera argues that the State did not need L.R.'s testimony because the only evidence that the defense presented regarding the defensive theory of fabrication or monetary incentive amounted to two statements from Lisset. Herrera asserts that any other evidence regarding the defensive theory of fabrication or monetary incentive was preemptively elicited by the State. Herrera also argues that the State did not need L.R.'s testimony because of the presence of other compelling evidence supporting M.R.'s account. Herrera points out that his former wife Rosie testified that he made statements implicating himself in the charged crime and that M.R.'s brother J.R. testified to witnessing complained-of acts. The State responds that it had a "strong need" to refute Herrera's defensive theory that M.R. and other family members fabricated M.R.'s testimony to gain access to his financial assets.

While Lisset's testimony may have been the most candid testimony regarding the defensive theory of fabrication or monetary incentive, we do not believe that it was the *only* evidence presented by the defense to support the theory. Herrera pointed out during cross-examination the lack of immediate reporting of M.R.'s outcry to law enforcement. Herrera also pointed out during cross-examination the close relationship between M.R. and Rosie. And even as early as the defense's opening statement, Herrera's counsel mentioned Rosie's monetary incentive: "[Herrera], through his hard work, has put together a pretty good nest egg. A nest egg that's envied by the person closest to him. That's his wife, Rosie . . . ." Furthermore, regarding the presence of other compelling

evidence, Lisset's testimony contested J.R.'s ability to see what he testified to witnessing. There was also no physical evidence connecting Herrera to the offense. We believe that this factor thus weighs in favor of admissibility.

*Tendency of evidence to suggest a decision on an improper basis*: Extraneous-offense evidence of this nature does have a tendency to suggest a verdict on an improper basis because of the inherently inflammatory and prejudicial nature of crimes of a sexual nature committed against children. *Newton*, 301 S.W.3d at 320. But the trial court gave the following instruction just before L.R. testified:

> There may be testimony introduced regarding extraneous crimes or bad acts other than the one charged in the indictment in this case. This testimony and evidence may be admitted only for the purpose of assisting you, if it does, in showing the Defendant's motive, intent, knowledge, lack of mistake or accident, if any, to rebut any defensive theory in connection with the offense alleged in the indictment in this case, or for any bearing the evidence has on relevant matters, including the character of the Defendant, and acts performed in conformity with that character and for no other purpose.

> You cannot consider that testimony and evidence unless you find beyond a reasonable doubt that the Defendant committed the acts which may be referenced.

And the trial court gave a similar limiting instruction in the jury charge:

> There has been introduced testimony and evidence of alleged extraneous crimes or bad acts other than the one charged in the indictment in this case. This testimony and evidence was admitted only for the purpose of assisting you, if it does, in showing the defendant's motive, intent, knowledge, lack of mistake or accident, if any; to rebut any defensive theory in connection with the offense alleged in the indictment in this case, or for any bearing the evidence has on relevant matters, including the character of the Defendant and acts performed in conformity with the character of the Defendant, and for no other purpose. You cannot consider such testimony and evidence unless you find and believe beyond a reasonable doubt the defendant committed these acts.

We generally presume that the jury follows the trial court's instructions in the manner presented. *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). Herrera argues, however, that the limiting instruction was not a sufficient safeguard against the prejudice such evidence created and that the limiting instruction instead created additional danger of unfair prejudice and confusion. We conclude that although the danger of unfair prejudice was counter-balanced to some extent by the trial court's limiting instruction, this factor nevertheless weighs in favor of exclusion of the evidence.

*Jury confusion or distraction, undue weight, and amount of time or repetition*: These factors concern whether presentation of the evidence consumed an inordinate amount of time or was repetitious, and the evidence's tendency to confuse or distract the jury or to cause the jury to place undue weight on its probative value. *See Gigliobianco*, 210 S.W.3d at 641-42; *Newton*, 301 S.W.3d at 320. Herrera argues that, similarly to the previous factor, the extraneous-offense evidence had a tendency to confuse the jury and had a tendency to be given undue weight by the jury. Herrera acknowledges, however, that the presentation of the extraneous-offense evidence did not consume an inordinate amount of time. L.R.'s entire testimony consisted of only twenty-seven pages of the reporter's record. It was not repetitious. Furthermore, as stated above, the danger of unfair prejudice was counter-balanced to some extent by the trial court's limiting instructions. We conclude that these factors thus favor admission.

Rule 403 "envisions exclusion of [relevant] evidence only when there is a 'clear disparity between the degree of prejudice of the offered evidence and its probative

value.'" *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009) (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)). We cannot say that there is a "clear disparity" between the danger of unfair prejudice posed by the extraneous-offense evidence and its probative value. Therefore, we hold that the trial court did not abuse its discretion in admitting the extraneous-offense evidence. We overrule Herrera's second issue.

Having overruled both of Herrera's issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
     (Chief Justice Gray concurs with a note)*
Affirmed
Opinion delivered and filed July 27, 2016
Do not publish
[CRPM]

*(Chief Justice Gray concurs in the judgment only. A separate opinion will not issue. He notes, however, that he would weigh the factors on the second issue somewhat differently but would reach the same conclusion as the Court.)

