Affirmed and Memorandum Opinion filed January 11, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00275-CR

___________________

 

Damien Lamar Freddie, Appellant

 

V.

 

the State of Texas, Appellee



 



 

On
Appeal from the 240th District Court

Fort Bend County,
Texas



Trial Court Cause No. 45741

 



 

 

MEMORANDUM OPINION

 

            A jury found
appellant Damien Lamar Freddie guilty of murder and sentenced him to ninety
years’ confinement in the Institutional Division of the Texas Department of
Criminal Justice.  Freddie appeals his conviction contending that: (1) the
evidence at trial is factually insufficient to support a “guilty” verdict; (2)
the trial court improperly denied a requested instruction on the lesser charge
of aggravated assault; and (3) the trial court improperly denied a requested
instruction on the lesser charge of deadly conduct.  We affirm.  

I

Early in the morning on November 24, 2005, Damien
Freddie, Antonio Leonard, and Laviron “Lee-Lee” Billow were playing dice in a
southwest Houston apartment.  Shawn “Rock” Mayries was also in the apartment
but was only watching the game.  Both Billow and Mayries testified that after
playing dice for several hours Freddie began dropping in and out of the game
and pacing back and forth between the game and a window.  Freddie eventually
locked the front door, brandished a handgun, and announced his intention to rob
everyone in the apartment.  After failing to comply with Freddie’s commands to
give up his money, Leonard made a break for the front door in an attempt to
escape.  Both Billow and Mayries testified that Freddie shot Leonard in the
back multiple times as Leonard ran toward the door.  Both men testified that
despite having been shot, Leonard managed to open the door and run down a
staircase while Freddie pursued and, according to Mayries, continued firing. 
Having sustained three gunshot wounds, Leonard collapsed and died on the
staircase.   

Leonard’s ex-fiancé, Dewana Fruge, and his current
girlfriend, Jennifer Robinson, were in the parking lot directly outside the
third-floor apartment when the shooting occurred.  Both gave statements to
police at the scene.  Fruge testified at trial that after the shots rang out
she saw Leonard run out of the apartment and down a staircase that opened up to
the parking lot.  Fruge then saw another man she could not positively identify
run out the apartment and head down a staircase directly opposite from the one
Leonard ran down and which opened up to the other side of the building.  Fruge
approached the base of the staircase Leonard was descending, but when Leonard
did not appear, Fruge went up the stairs and found his body.  She and Robinson
then left the scene to fetch Leonard’s mother.  Fruge testified that upon
returning, she came across Billow, whom she knew, “hiding in the bushes.” 
Fruge testified the clothing Billow was wearing matched the clothing of the
second man she saw leaving the apartment.  

Shortly after arriving on the scene, police arrested
Billow on open warrants for unpaid traffic tickets.  Once in custody, Billow
told investigators that several unknown men had burst into the apartment and
attempted to rob everyone there.  Detective Roy Swainson of the Houston Police
Department testified he doubted Billow’s story.  Billow had earlier submitted
to a gunshot-residue test, and although results of the test were not yet
available, Swainson told Billow his results had come back positive.  Billow’s
results would in fact later come back negative, but upon hearing this false
report Billow changed his story and said Freddie shot Leonard after attempting
to rob those at the dice game.  He did not mention Mayries was also present at
the game.  

Billow also told Swainson that immediately after the
shooting he and Freddie ran to Freddie’s girlfriend’s apartment, which was
located in the same complex, and that Freddie hid the gun in a barrette box in
her closet.  Billow led investigators to the apartment later that day.  Stevie
Smith, Freddie’s girlfriend, along with other residents of the apartment, all
denied knowing Freddie.  But after obtaining Smith’s permission to search her
room, police found a duffel bag containing Freddie’s driver’s license and some
of his college transcripts.  They did not find the gun Billow said Freddie hid
in the closet.  Although Smith still denied knowing Freddie, Swainson left his
card with her and asked her to tell Freddie to call him.  

Swainson had a voice message from Freddie by the time
he returned to his office later that day.  Swainson returned the phone call and
recorded a conversation in which Freddie said he had been in the apartment
playing dice but that he left before the shooting took place and did not hear
of the incident until sometime between 7 and 9 that morning.  He also told
Swainson that a fourth person he knew only as “Rock” was also present at the
game.  Freddie set an appointment for the following Monday to come in to
Swainson’s office and give a voluntary statement but never showed up.  

Swainson then asked Billow whether “Rock” was also
present at the game and Billow immediately admitted he was.  Billow led
Swainson to the apartment where “Rock” had been staying with his sister. 
“Rock” was nowhere to be found, but through a series of phone calls Swainson
learned his given name was Shawn Mayries and was able to contact him on his
cell phone.  Mayries gave Swainson a detailed statement in which he claimed
Freddie shot and killed Leonard.  According to his statement, Mayries fled to
his native Florida the day after the shooting.  He claimed he went to Florida
to escape four unknown men who had assaulted him and warned him not to talk to
authorities about the shooting.  

            Swainson sought a
warrant for Freddie’s arrest in January 2006, but for reasons that are not
clear from the record, the warrant request would not be approved until
October.  Freddie was arrested and provided a recorded statement in which he
again admitted he had been in the apartment with the three other men playing
dice but insisted he left without incident sometime around 1 to 2 a.m.  He
claimed he was not responsible for the shooting and did not know why Billow and
Mayries were blaming him.  After securing Freddie’s statement, Swainson made a
second visit to Smith’s apartment.  While she was still reluctant to offer
information incriminating Freddie, this time Smith said that Freddie and Billow
had entered her room on the morning of the shooting while she was sleeping and
that Freddie had hidden a gun in her closet and then slept in her room before
leaving around 7 or 8 a.m.  She also said that shortly before Freddie was
arrested he confessed to her that he shot Leonard, although he claimed the
group was being robbed and that the shooting was in self-defense.  

At trial, defense counsel sought to paint Billow and
Mayries as unreliable witnesses whose stories were inconsistent.  It was
repeatedly pointed out that Billow changed his story three times between the
morning of the shooting and trial and that Mayries had fled the state after the
shooting and had weeks to concoct a detailed story before talking to police. 
While both men testified at trial to the same basic facts of the shooting,
there were arguably some discrepancies between their stories.  Most
significantly, Billow seemingly testified that he, Freddie, and Mayries fled
the apartment by going down the same staircase where Leonard ultimately died,
necessarily passing the body as they exited.  Mayries, however, testified that
he and Billow fled down another staircase which provided an exit from the
building opposite from the direction in which Leonard had fled and Freddie
pursued.  Fruge’s testimony conflicted with both accounts, as she said she saw only
Leonard flee down the staircase that opened up to the parking lot and only one
other man—whose description best matched Billow—leave the apartment and flee
down the opposite staircase.  

II

A

Freddie’s primary complaint on appeal is that the
evidence presented at trial is factually insufficient to support his murder
conviction.  However, while this appeal was pending, a majority of the judges
on the Court of Criminal Appeals have determined that the Jackson v.
Virginia legal-sufficiency standard is the only standard that a reviewing
court should apply in determining whether the evidence is sufficient to support
each element of a criminal offense that the State is required to prove beyond a
reasonable doubt.  Brooks v. State, 323 S.W.3d 893, 895 (Tex. Crim.
App. 2010) (plurality op.) (Hervey, J., joined by Keller, P.J., Keasler, and
Cochran, J.J.); id. at 926 (Cochran, J., concurring, joined by Womack,
J.) (same conclusion as plurality).  Accordingly, we will analyze Freddie’s
factual-sufficiency issue under the Jackson v. Virginia standard.  See
id. at 912 (plurality op.); Pomier v. State, No. 14-09-00247-CR, ___
S.W.3d ___, 2010 WL 4132209, at *2 (Tex. App.—Houston [14th Dist.] October 21,
2010, no pet.).  

In evaluating the legal sufficiency of the evidence
to support a criminal conviction, we view all evidence in the light most
favorable to the verdict and determine whether a rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt.  Jackson,
443 U.S. at 319; Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007);
Childs v. State, 21 S.W.3d 631, 634 (Tex. App.—Houston [14th Dist.]
2000, pet. ref’d).  We give deference to “‘the responsibility of the trier of
fact to fairly resolve conflicts in testimony, to weigh the evidence, and to
draw reasonable inferences from basic facts to ultimate facts.’”  Hooper,
214 S.W.3d at 13 (quoting Jackson, 443 U.S. at 318–19).  The jury is the
exclusive judge of the credibility of the witnesses and of the weight to be
given their testimony, and it is the exclusive province of the jury to
reconcile conflicts in the evidence.  Mosley v. State, 983 S.W.2d 249,
254 (Tex. Crim. App. 1998).  Hence, we do not reevaluate the weight and credibility
of all the evidence or substitute our judgment for the fact finder’s.  King
v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  Appellate courts
merely ensure that the jury’s decision was rational.  Muniz v. State,
851 S.W.2d 238, 246 (Tex. Crim. App. 1993); Harris v. State, 164 S.W.3d
775, 784 (Tex. App.—Houston [14th Dist.] 2005, pet. ref’d). Additionally, we
consider all of the evidence, whether admissible or inadmissible.  Clayton
v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

B

Freddie’s arguments against the sufficiency of the
evidence revolve largely around questioning the credibility of the witnesses
against him.  He maintains Billow is an unreliable witness because he was
initially a suspect in the shooting, changed his story at least three times,
and has since accumulated an unrelated felony conviction.  Mayries’s
culpability and credibility is questionable, according to Freddie, because he
immediately fled to Florida and had weeks to craft his story before speaking to
investigators.  Smith, Freddie contends, is a “jealous ex-girlfriend” seeking
revenge on Freddie.  He also focuses on perceived conflicts between Billow’s
and Mayries’s accounts of how they exited the complex immediately following the
shooting as well as Fruge’s testimony that she saw only one man other than
Leonard exiting the apartment after the shooting—a man whose description best
matches Billow.  

Freddie further complains generally that there was no
physical or forensic evidence linking him to the murder and points to a
supposed alibi provided by Smith’s mother, Denise Greviance, who lived with
Smith at the apartment in which Freddie hid his gun and slept on the morning of
the shooting.  Finally, Freddie argues that the autopsy report shows that
Leonard was not necessarily shot under the circumstances Billow and Mayries
described.[1] 
Freddie claims these deficiencies in the State’s case, taken together, rendered
the evidence insufficient to enable a rational jury to find him guilty beyond a
reasonable doubt. 

It is not clear that any of the evidence—testimonial
or otherwise—that Freddie suggests conflicts with Billow’s and Mayries’s
accounts actually presents any conflict at all.  We begin with the supposed
disparity between Billow’s and Mayries’s accounts of how they exited the
apartment complex immediately following the shooting.  Mayries testified that
he and Billow fled down the staircase opposite from the one Leonard descended
and upon which he ultimately died.  But when the prosecution first asked Billow
whether he went down the same staircase as Leonard, Billow responded, “I went
down the same one.”  On cross examination, Billow testified that “Rock went in
a direction and me and Damien went in one.”  Three questions later Billow
testified that he and Freddie fled in a different direction than Mayries, but
it is not clear from the cold record whether Billow was referring to their
flight down the staircase or some time afterward.  Defense counsel attempted to
clarify Billow’s testimony regarding the escape paths by showing him pictures
of the complex and asking him to point out his route.  But counsel did not make
Billow’s indications clear for the record, leaving it impossible for this
court, unlike the jury, to ascertain that part of Billow’s testimony.  Later,
on re-direct examination, Billow testified he was “pretty sure” he, Freddie,
and Mayries came down the same staircase as Leonard.  The jury was free to draw
conclusions as to whether Billow understood the questions being asked of him,
how confident he was in the details of his escape path, whether it conflicted
with Mayries’s testimony, and if so, whether that conflict was reconcilable or
material to the ultimate question in the case.  See Mosley, 983 S.W.2d
at 254; King, 29 S.W.3d 562.  

Dewana Fruge’s testimony as to what she witnessed
from the parking lot immediately following the shooting also does not
necessarily contradict Billow’s and Mayries’s testimony.  Even if it did, a
rational jury need not see it as a fatal contradiction as Fruge admitted it was
dark and that she had ducked behind a car when the shooting began. 
Additionally, she testified that after seeing Leonard coming down the stairs
she approached the staircase from the ground floor to meet him, thus losing her
vantage point from which she could see who was leaving or entering the
third-story apartment.  Her testimony could be rationally reconciled with
Billow’s and Mayries’s by concluding she simply did not see everyone who came
out of the apartment or that her recollection had not served her well. 
Furthermore, her testimony that the one man she did see come out of the
apartment after Leonard wore clothes matching what she later saw Billow wearing
does not lead inexorably to a conclusion that Billow pulled the trigger and
Freddie did not, especially since Billow admitted he was in the apartment when
the shooting occurred.  

Similarly, Greviance’s supposed alibi also does not
necessarily conflict with Billow’s and Mayries’s testimony.  Greviance
testified that she had looked in Smith’s room and saw Freddie sleeping on the
floor between 12:30 and 1:00 on the morning of the shooting.  The shooting,
however, took place sometime after 3:00 a.m.  Even if the jury credited
Greviance’s testimony as true, it was entirely possible that Freddie left
Greviance’s apartment sometime during the span of time between when Greviance
saw him sleeping and the shooting.  Greviance herself testified she did not
always know when people would come and leave her apartment and admitted it was
possible Freddie left without her knowledge after she saw him sleeping.  As
such, this supposed alibi would not prevent a rational jury from convicting
Freddie.  

Finally, Freddie suggests the autopsy report
conflicts with Billow’s and Mayries’s accounts of how Leonard was shot.  But he
does not point to any specific conclusions in the autopsy report or testimony
proffered at trial to support an interpretation that Leonard died under
circumstances different than those described by Billow and Mayries.  The jury
could have concluded the autopsy report corroborated the witness accounts of
the shooting.[2] 


Upon examining the record as a whole, we find there
was sufficient evidence for a rational jury to find all the elements of murder
were met beyond a reasonable doubt.  Criminal prosecutions are often made or
broken on the believability of a handful of witnesses who are neither model
citizens nor perfectly consistent in their testimony.  The jury was made aware
that Billow changed his story and that he was a convicted felon, just as it was
made aware that Mayries fled Houston to Florida after the shooting.  The jury’s
role as trier of fact renders it the sole judge of the credibility of the
witnesses and strength of their testimony.  See Fuentes v. State, 991
S.W.2d 267, 271 (Tex. Crim. App. 1999).  Similarly, to the extent that
conflicts actually existed in the testimony presented, it is fully and
exclusively within the jury’s province to resolve those conflicts.  See Moseley,
983 S.W.2d at 254.  Billow and Mayries did not differ on any details essential
to the basic facts of the incident, and any supposed conflicts between the two
were marginal enough that the jury was free to reconcile the differences or
resolve them in favor of one party or the other depending on its evaluation of that
witness’s credibility, clarity, and confidence of memory.  We do not reevaluate
the weight and credibility of all the evidence or substitute our judgment for
the fact finder’s.  See Chambers v. State, 805 S.W.2d 459, 461 (Tex.
Crim. App. 1991); Losada v. State, 721 S.W.2d 305, 309 (Tex. Crim. App.
1986).  

Two witnesses claimed to watch Freddie murder
Leonard, and a third said Freddie hid a gun in her bedroom after the incident
and later confessed to her that he shot Leonard.  While Freddie is correct that
police did not locate a murder weapon or recover fingerprints from the scene,
he is incorrect to suggest that no physical evidence linked him to the crime. 
To the contrary, physical evidence corroborated both Billow’s and Mayries’s
testimony, including Leonard’s body, a pair of dice nearby, an envelope filled
with money in Leonard’s pocket, multiple gunshot wounds, a trail of blood
leading out the apartment door, and reports from crime-scene investigators that
examinations of bullet trajectory revealed the shots were fired from within the
vicinity of the apartment’s dining room.  The foregoing evidence was sufficient
to enable a rational jury to find all the elements of murder established beyond
a reasonable doubt.  Freddie’s first point of error is overruled.  

III

In Freddie’s second and third issues, he contends the
trial court erred by failing to charge the jury on the lesser-included offenses
of aggravated assault[3]
and deadly conduct.[4] 
Defense counsel timely requested both instructions before the jury was charged,
and both were refused by the court.        

In deciding whether the jury should have been charged
on a lesser-included offense, we apply a two-prong test.  Segundo v. State,
270 S.W.3d 79, 90 (Tex. Crim. App. 2008); see also Hall v. State, 225
S.W.3d 524, 528 (Tex. Crim. App. 2007).  First, we determine if the offense is
a lesser-included offense of the charged offense.  Salazar v. State, 284
S.W.3d 874, 875–76 (Tex. Crim. App. 2009); Hall, 225 S.W.3d at 535–36.  Second,
we determine if there is some evidence in the record “from which a rational
jury could acquit the defendant of the greater offense while convicting him of
the lesser-included offense.”  Segundo, 270 S.W.3d at 90–91.  

In evaluating the second prong, we review the entire
record.  Moore v. State, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).  Before
a defendant is entitled to a charge on a lesser- included offense, the evidence
must not merely raise the possibility of the lesser offense, but must establish
the lesser-included offense as a valid rational alternative to the charged
offense.  Wesbrook v. State, 29 S.W.3d 103, 113–14 (Tex. Crim. App.
2000).  In this analysis, anything more than a scintilla of evidence can be
enough to afford the defendant a lesser-included charge.  Hall, 225
S.W.3d at 536.  However, if a defendant either presents evidence that he
committed no offense or presents no evidence, and there is no evidence
otherwise showing he is guilty only of a lesser-included offense, then a charge
on a lesser-included offense is not required.  Nash v. State, 115 S.W.3d
136, 139 (Tex. App.—Texarkana 2003, pet. ref’d) (citing Aguilar v. State,
682 S.W.2d 556, 558 (Tex. Crim. App. 1985)).

As a matter of law, aggravated assault and deadly
conduct are lesser-included offenses of murder.  Flores v. State, 245
S.W.3d 432, 440 (Tex. Crim. App. 2008); Cardenas v. State, 30 S.W.3d
384, 392 (Tex. Crim. App. 2000).  The first prong is therefore satisfied.  Freddie
contends, however, that sufficient evidence was presented that would enable a
rational jury to acquit Freddie of murder while convicting him of aggravated
assault or deadly conduct.  We disagree.

It is not clear from Freddie’s briefing what theory
he wished the jury, and this court, to consider as a rational alternative that
would have resulted in his acquittal of murder but under which he potentially
would be held responsible for aggravated assault or deadly conduct.  Such a
theory would require evidence showing Freddie was present at the shooting and
fired a gun but lacked the intent to kill necessary to sustain a murder
conviction.  No such evidence was presented.  Instead, the jury heard two
recorded conversations with Freddie—one a pre-arrest phone conversation between
Freddie and Detective Swainson, and the second a post-arrest interview—in which
Freddie claimed he left the apartment before the shooting occurred.  Freddie
does not claim, and there was no evidence to suggest, that Freddie fired
multiple shots, three of which hit and ultimately killed Leonard, but lacked
the requisite intent for murder while potentially fulfilling the elements of
either aggravated assault or deadly conduct.  This contradiction between the
evidence presented and the facts that must necessarily exist to support the
requested lesser-included offense instructions cannot give rise to a rational
alternative from which the jury could convict Freddie of aggravated assault or
deadly conduct but not murder.  

Freddie also points to Billow’s original statement to
police that a group of unknown robbers burst in the apartment with the
intention of robbing all four men, presumably to pose Billow’s original story
as an alternative set of facts the jury could have accepted.  However, it is
not explained why Billow’s original story, even if believed by the jury, would
warrant a lesser-included offense instruction of aggravated assault or deadly
conduct.  Moreover, Billow himself abandoned the story mere hours after
offering it and Freddie also contradicts it by claiming to police he was not at
the apartment when the shooting occurred.  While defense counsel made use of
the contradiction in Billow’s stories to paint him as an unreliable witness, no
evidence or argument was presented to show Billow’s original story was in fact
true.  An alternative story later confessed by the storyteller to be a lie and
contradicted by a defendant’s own statement to police can hardly be considered
an alternative on which a jury could rationally rely to arrive at the conclusion
that Freddie was at the scene, despite his statements to the contrary, and
fired multiple shots but did not intend to kill Leonard.  Freddie’s statements
to the police present evidence that he committed no crime, not that he lacked
intent to commit a greater crime but could be convicted of a lesser crime; as
such, he is not entitled to instructions on the lesser-included offenses.  See
Nash, 115 S.W.3d at 136.

Finally, Freddie argues for the first time on appeal
that the trajectory report from the autopsy “does not accurately reflect that
the deceased was shot in the back, but rather appeared to have been shot from
the side or perhaps from the front and side during a struggle of movement.”  It
is not explained on appeal whether this observation is meant to insinuate that
someone else shot Leonard or that Freddie shot him but did so without murderous
intent.  Either way, this argument was not raised at trial, nor was any
evidence presented showing the autopsy report conflicted with witness accounts
of the shooting.  Defense counsel did not pursue any line of questioning to
support the theory during cross-examination of the medical examiner who
interpreted the autopsy report.  As such, it cannot be argued that at trial it
was evidence that contributed toward presentation of a rational alternative to
the offense of murder.  See Wesbrook, 29 S.W.3d at 113–14.

The evidence does not show, and Freddie’s statements
contradict, any scenario under which a rational jury could acquit him of murder
but convict him of aggravated assault or deadly conduct because no evidence
presented at trial offered an alternative set of events or circumstances under
which Freddie fired a gun and killed Leonard but lacked murderous intent.  A
murder defendant is not entitled to an instruction on the lesser offense of
aggravated assault or deadly conduct when the evidence showed him, at the
least, to be guilty of a homicide.  See Jackson v. State, 992 S.W.2d
469, 475 (Tex. Crim. App. 1999).  The evidence presented to the jury at trial
did not call into question whether Leonard was killed with murderous intent—all
the evidence indicated he was.  The only question was who pulled the trigger,
and whoever did was guilty of at least murder.  Freddie’s second and third
points are overruled.  

* * *

For the
foregoing reasons, we affirm the trial court’s judgment.

                                                                                    

                                                                                    

                                                                        /s/        Justice
Jeffrey V. Brown

                                                                                    Justice

 

 

Panel consists of Justices
Anderson, Frost, and Brown.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] In his brief, Freddie
describes the alternative scenarios this way:  “either a side, ie [sic] the
left side shooting of Mr. Leonard, or, a shooting where the two individuals are
perhaps facing each other at an angle and at one point a right handed shooter
perhaps moved to the left of Mr. Leonard, or that Mr. Leonard was shot in a
struggle which would explain why gunshot residue appeared in his hands.”





[2] A Fort Bend County
medical examiner testified at trial about Leonard’s gunshot wounds, including
their entrance and exit points.  The medical examiner testified that Leonard
suffered three gunshot wounds.  The first entered through the back of his left
arm and did not exit.  The second “was the front of the chest just in front
which went into the chest cavity, caused some damage to the lung and came out
in the middle of the chest.”  The third hit Leonard in the “left lower back”
and “went into the abdomen and punctured the kidney, the liver, the heart and
the right lung and came up on the back of the right shoulder.”  Defense counsel
did not clarify the medical examiner’s testimony on cross-examination or
develop any testimony supportive of the interpretation Freddie suggests for the
first time on appeal.  





[3] Tex. Penal Code §§ 22.01,
22.02.  





[4] Tex. Penal Code § 22.05.