*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*





## MEMORANDUM OPINION

No. 04-09-00580-CR

Jerry Christopher **CRISP**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 144th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-6737
Honorable Catherine Torres-Stahl, Judge Presiding[1]

Opinion by:    Catherine Stone, Chief Justice

Sitting:       Catherine Stone, Chief Justice
               Karen Angelini, Justice
               Marialyn Barnard, Justice

Delivered and Filed:   March 16, 2011

AFFIRMED

Jerry Crisp was convicted of felony murder in connection with the death of his infant

daughter.  On appeal, we are asked to decide whether: (1) there is sufficient evidence to support

Crisp's conviction for felony murder; (2) the trial court erred in charging the jury on a theory of

guilt that allegedly is not supported by the evidence; and (3) the trial court erred by depriving

Crisp of his right to a meaningful opportunity to present a complete defense.  We affirm.

---

[1] The Honorable Philip Kazen accepted the jury's verdict during the guilt-innocence phase of the trial and the Honorable Pat Priest conducted the punishment phase of the trial.

## BACKGROUND

Crisp and his girlfriend, Cassandra Flores ("Cassandra"), were the parents of Jayden Crisp, who was born on February 12, 2005. Cassandra relied heavily upon Crisp immediately following Jayden's birth because she was "pretty nervous" about having a newborn infant and had little experience caring for children. Crisp, on the other hand, felt comfortable around children because his mother used to operate a childcare business. As Cassandra became more confident and wanted to become more involved in Jayden's care, Crisp insisted on remaining Jayden's primary caregiver.

When Jayden was approximately one-month old, Cassandra began noticing dime-sized bruises on the child's cheeks. Cassandra asked Crisp about the bruises, and he responded that Jayden had inflicted the injuries to herself by grabbing her cheeks when she was angry, upset, or constipated. In addition to the bruises, Cassandra noticed redness/bleeding on the inner part of Jayden's eye. Cassandra was concerned about Jayden's eye when she observed the redness/bleeding for a second time. Although Crisp did not think Jayden's eye warranted medical attention, Cassandra eventually took Jayden to the doctor and got an ointment for Jayden's eye.

Crisp went out of town on business from April 18, 2005 until April 22, 2005. During Crisp's time away, Cassandra became even more confident in her ability to care for the child. Jayden did not show any signs of bruising during Crisp's absence.

On April 22, 2005, Cassandra's sister-in-law, Sheila Flores, cared for Jayden while Cassandra was at work. Sheila changed Jayden's clothing and diaper several times, and like Cassandra, observed no bruising on Jayden's body. Sheila did note she observed a tiny, light bruise on Jayden's face earlier in the week, but believed it was healing and going away. Jayden

was watched closely by Sheila, who made sure Jayden was not injured while under her supervision.

Jayden was asleep when Cassandra and Crisp, who had just returned to town, picked up Jayden from Sheila's care. Jayden began to stir upon arriving home so Cassandra and Crisp played with Jayden before putting her back to bed. Crisp mentioned to Cassandra that Jayden may have been injured while she was with Sheila because he thought he saw thumbprint bruises on the child's chest. Despite his purported observation of bruising on his daughter's chest, Crisp did not say anything to Sheila about the bruises when she came over to pick up her payment for watching Jayden.

Jayden appeared happy and healthy upon awaking the next morning, April 23, 2005, and the family decided to attend a barbeque. After the barbeque, Cassandra, Crisp, and Jayden returned home and Jayden fell asleep without incident. Although Crisp had reported seeing bruises on Jayden's chest the prior night, Cassandra did not observe any bruising on the child's body that day.

The following morning, April 24, 2005, Cassandra again observed no bruises on Jayden's body when they left to assist Sheila move some items out of her storage unit. Jayden began crying when they arrived at the storage facility, so Crisp took Jayden while Cassandra assisted Sheila. When Cassandra and Sheila finished moving, Crisp was in the process of changing Jayden's diaper. Jayden, however, was crying and screaming even more loudly than when Cassandra had left to help Sheila. Sheila took Jayden from Crisp and was able to sooth the child almost immediately. Upon soothing Jayden, Sheila noticed a small amount of blood on Jayden's lip. After unsuccessfully trying to determine why Jayden was bleeding, everyone went to dinner.

Jayden remained quiet throughout the course of dinner, and Cassandra, Crisp, and Jayden returned home by 9:00 p.m. or 10:00 p.m. that night.

The next day, April 25, 2005, Cassandra woke up late and was unable to feed Jayden before leaving for work. Cassandra attempted to feed Jayden on the way to work, but Jayden would not eat. Jayden otherwise appeared fine when Crisp dropped Cassandra off at work.

Crisp and Jayden met Cassandra for lunch later that same day. When Cassandra saw Jayden she thought Jayden "looked absolutely horrible" and barely recognized her daughter. Jayden allegedly "looked like a raccoon because she had these purple little dots all around" both of her eyes. In addition, Jayden was wheezing and pumping her left arm up and down and was "just staring off into space." Cassandra was worried about Jayden upon seeing her condition, but Crisp told Cassandra that Jayden did not need to see a doctor because she was just constipated and suffering from allergies.

When Crisp picked Cassandra up after work, Cassandra did not hear any wheezing coming from Jayden and saw a blanket covering Jayden's car seat. Crisp told Cassandra not to disturb Jayden because she had just fallen asleep. Crisp further informed Cassandra that Jayden had accidentally rolled off the changing table. Although Jayden cried after her fall, Crisp told Cassandra that Jayden eventually fell asleep. Cassandra wanted to take Jayden to the hospital, but Crisp once again assured Cassandra that Jayden was fine and did not need to see a doctor.

When they returned to their apartment, Crisp took Jayden upstairs in her car seat so that she could rest. Crisp went to retrieve Jayden approximately thirty minutes later. When Crisp went upstairs, he began to yell that he could not tell if Jayden was breathing. Cassandra ran upstairs and saw Jayden still sitting inside her car seat. Jayden's lips and finger tips were blue

and her eyes were open and dilated. Jayden was very cold and nonresponsive. Cassandra immediately dialed 9-1-1.

Although Cassandra called 9-1-1, Crisp had to speak with the operator because Cassandra was hysterical. Crisp began performing chest compressions on Jayden until emergency personnel arrived four to five minutes later. When emergency personnel arrived, Lieutenant Stephen Torres of the San Antonio Fire Department took Jayden from Crisp. Torres performed CPR on Jayden as he rushed the child over to the paramedic team.

Paramedic Ty Siebert and his partner began performing infant CPR on Jayden, while another firefighter "bagged" Jayden.[2] Jayden felt very cold, and her temperature registered only 90 degrees Fahrenheit. Paramedics placed a heart monitor on Jayden, which showed Jayden's heart was no longer beating and that she was dead.

During the course of placing the heart monitor on Jayden, "everyone in the ambulance t[ook] a pause" upon seeing the child's physical condition. Medical personnel observed "multiple spots of bruising everywhere" on the child, including bruising on Jayden's face, cheeks, shoulders, chin, neck, jaw, stomach, chest, arms, forehead, and hip area. According to Paramedic Siebert, Jayden had "20-plus" bruises on her chest area alone. Medical personnel also observed petechial hemorrhages, *i.e.*, broken capillaries, on Jayden's cheeks and near her eyes. When Jayden was turned over, the paramedics observed signs of postmortem lividity, *i.e.*, the settling of fluids, in the child's lower back and buttock region. This postmortem lividity suggested to medical personnel that Jayden's heart had stopped beating for a considerable length of time. Due to Jayden's physical condition, medical personnel suspected Jayden was a victim of abuse and the police were notified about Jayden's death.

---

[2] "Bagging" takes the place of mouth-to-mouth resuscitation and involves using a specialized plastic bag to force air into the victim.

Medical personnel informed Cassandra and Crisp about their daughter's death. Cassandra was visibly upset by the news and began accusing the medical personnel of not doing enough to help her daughter. Cassandra then turned to Crisp and yelled, "[w]hat happened to her?" Crisp, who also appeared upset by his daughter's death,[3] was unable to respond. Cassandra pushed Crisp away and threw a telephone at his feet when he tried to console her.

Crisp told San Antonio Fire Fighter Sarah Wueste that Jayden was ill and had become "worse" after swallowing bathwater that day. He told Wueste that Jayden was under his supervision all day and that she had fallen off their twenty-nine inch tall changing table "only once" that day. Crisp further told Wueste that when Jayden woke up there was some bruising on her chest, but he could not explain how Jayden got any of the bruises.[4]

Officer Scott Knirlberger of the San Antonio Police Department arrived at the scene and spoke with Crisp about Jayden's death. Crisp told Officer Knirlberger that Jayden did not have an appetite and had been sick, wheezing, and crying. He reported to the officer that when he went upstairs to get Jayden, he discovered her cold, blue, and not breathing. Because Crisp had an outstanding warrant issued for his arrest, officers took Crisp into custody.

Once in custody, Crisp told detectives Jayden fell off the changing table and had struck her head on a shelf. Crisp admitted he was frustrated with Jayden because he had just finished working 87 hours over the course of four days and the child would not stop crying. He reported that he was firm with Jayden, "maybe squeezed her too tight," and held his daughter tightly by the neck. Crisp was unable to give the police a reasonable explanation for all of the bruises on Jayden. At some point during his interview, Crisp changed his story and told police that he had grabbed Jayden's thigh or leg when she fell.

---

[3] Crisp claimed to have an anxiety attack and was observed hyperventilating at the scene.
[4] The record shows that after they learned about Jayden's death, Crisp instructed Cassandra to tell the authorities/medical personnel that she had seen bruises on Jayden as well.

Crisp told officers in a later interview that he was alone with Jayden all day before she died. He told police that he had problems dealing with his stress and anger and stated that he "snap[s]." Crisp admitted he held Jayden's face up to his body long enough to take her breath away on the day of her death. He also acknowledged that he held her tightly by the neck, squeezed her firmly, and shook her because he snapped out of frustration. Crisp stated he stopped these acts around 10:00 a.m. because he realized he had hurt Jayden, who wheezed and fell asleep after his acts. Crisp told police Jayden fell off the changing table sometime after his lunch with Cassandra.

The autopsy report from the Bexar County Medical Examiner's Office revealed Jayden had bruises on her torso, right anterior shoulder, right upper chest, front left shoulder, central lower chest, lower left chest, middle upper abdomen, right upper abdomen, and lower left abdomen. The number and location of bruises found on Jayden's body indicated an adult had inflicted these injuries upon the child. Jayden also had multiple bruises on her head, including her forehead, cheek, chin, and behind her left ear. Like the other bruising observed on Jayden, these injuries were not self-inflicted. The Medical Examiner further observed that Jayden had petechial hemorrhages around her eyes.

The Medical Examiner also reported that Jayden suffered many recent internal injuries as well. She observed Jayden had an acute rib fracture, several older rib fractures, and hemorrhages on her back and scalp. The hemorrhages on Jayden's scalp were larger than the other bruises found on Jayden's body and were considered blunt force injuries caused by a minimum of two different impacts. Jayden additionally had a subdural hemorrhage, which is a hemorrhage over the brain between the dura membrane and the skull, and blood surrounding the brain in the arachnoid membrane. She also had approximately seven places where she sustained bruises on

her brain. Jayden's autopsy further revealed Jayden had hemorrhages on both sides of her optic nerve, retinal hemorrhages within her eyes, and brain swelling. Based on the blunt force injuries and petechial hemorrhaging observed during the autopsy, the Medical Examiner concluded Jayden's death resulted from blunt force trauma to the head as well as possible asphyxiation.[5]

Crisp was subsequently indicted for capital murder and proceeded to trial before a jury. During the State's case-in-chief, the jury heard testimony from numerous witnesses, including Cassandra, Sheila, the medical personnel who responded to Cassandra's 9-1-1 call, the officers who investigated Jayden's death, and the medical examiner who performed Jayden's autopsy (Dr. Kimberly Molina). The jury was also presented with the recordings of Crisp's interviews with police as well as photographs of Jayden's injuries. After the State rested, Crisp moved for a directed verdict, contending the prosecution had not proven capital murder beyond a reasonable doubt. He alleged the prosecution did not show he acted intentionally or knowingly. Crisp further alleged there was no proof of asphyxiation and requested the trial court to delete this theory of death from the indictment. The trial court denied Crisp's requests and he proceeded with his defense.

Crisp presented several witnesses at trial: his father, Jerry Crisp; his brother, Jason Crisp; Marci French; and Dr. William Anderson. From the testimony presented by Crisp's father and brother, the jury heard that Crisp had a good relationship with Jayden and was careful with her. Jerry also informed the jury that Crisp did not have a "temper problem," while Jason stated Crisp had learning disabilities and always tried to please people. French, Crisp's former special education school teacher, informed the jury that she tried to help Crisp cope with his disabilities.

---

[5] When she initially spoke with the police, Cassandra minimized how bad Jayden looked and told investigators that she had seen the bruising described by Crisp. Upon discovering that an accidental fall could not have caused Jayden's injuries, however, Cassandra admitted that she did not see any bruising on Jayden's body during her daughter's final days.

She further indicated Crisp likely had comprehension problems as an adult because children do not outgrow their disabilities.

Finally, Dr. Anderson testified he performed a second autopsy and reviewed the autopsy results performed by Dr. Molina. He testified that he believed an infant could die from falling off a twenty-nine inch tall changing table. Dr. Anderson stated recent studies suggest that a low velocity fall, like the one allegedly suffered by Jayden, can produce sufficient force to break capillaries and cause injuries consistent with those sustained by Jayden. He did not believe asphyxiation was the cause of Jayden's death and attributed Jayden's petechial hemorrhages to the paramedics' rescue efforts.

After hearing the evidence, the jury found Crisp guilty of the lesser included offense of felony murder in the course of committing injury to a child. *See* TEX. PENAL CODE ANN. § 19.02(b)(3) (West 2003). Crisp was sentenced to sixty years imprisonment for his crime and this appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In his second issue, Crisp argues the evidence is insufficient to support his conviction. While this appeal was pending, the Court of Criminal Appeals held that only one standard should be used to evaluate the sufficiency of the evidence in a criminal case: legal sufficiency. *Brooks v. State*, 323 S.W .3d 893, 895 (Tex. Crim. App. 2010). Accordingly, we review the sufficiency of the evidence in this case in accordance with the dictates of *Jackson v. Virginia*, 443 U.S. 307 (1979).

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Id*. at 879; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim.

App. 2007). This court does not sit as a thirteenth juror and may not substitute its judgment for that of the fact finder by re-evaluating the weight and credibility of the evidence. *Williams*, 235 S.W.3d at 750. Our duty as a reviewing court is to ensure the evidence presented actually supports a conclusion that the defendant committed the crime. *Id*.

"Felony murder is an unintentional murder committed in the course of committing a felony." *Fuentes v. State*, 991 S.W.2d 267, 272 (Tex. Crim. App. 1999). The Texas Penal Code provides that a person commits the offense of felony murder if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(3). Our law provides that a person commits the felony offense of injury to a child "if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes" bodily injury or serious bodily injury to a child. TEX. PEN. CODE ANN. § 22.04 (West Supp. 2010); *see generally Flores v. State*, 215 S.W.3d 520, 530 (Tex. App.—Beaumont 2007), *aff'd*, 245 S.W.3d 432 (Tex. Crim. App. 2008) (indicating felony murder may be a lesser-included offense of capital murder when the underlying felony is injury to a child).

Crisp contends the evidence as a whole does not rationally justify the jury's finding of guilt beyond a reasonable doubt. The evidence presented at trial focused on the nature of Jayden's injuries and Crisp's account of the events surrounding the child's death. The prosecution presented the jury with the recordings of Crisp's interviews with police, where he informed authorities that he was alone with Jayden throughout the day of her death and that he was frustrated with Jayden because she would not stop crying. Crisp admitted to officers that he

hurt Jayden by shaking her, holding her neck tightly, and squeezing her firmly after he snapped out of frustration.

The jury also heard medical testimony suggesting Jayden's injuries were caused by physical abuse as opposed to an accidental fall from a changing table. The State's expert, Dr. Molina, discounted the possibility that Jayden sustained her injuries during an accidental fall from a twenty-nine inch tall changing table. Not only was Jayden too young to roll over on her own,[6] Dr. Molina stated Jayden's head injuries were not consistent with an accidental fall. Dr. Molina noted Jayden had hemorrhaging on three sides of her scalp and stated a fall from a changing table would not have caused injuries to multiple sides of the scalp. She stated the bruise she observed behind Jayden's ear suggested the child was struck directly in that area as opposed to having rolled off a changing table. Dr. Molina further testified Jayden's autopsy revealed extensive damage around the child's brain, including: a subdural hemmorhage; significant amounts of blood and swelling; and multiple areas of bruising. She explained that in seventy-six infant homicide cases reviewed by the Medical Examiner's Office, less than one percent of the infant victims had bruising to their brains. According to Dr. Molina, the force needed to cause Jayden's head injuries was great and noted the force would be similar to "what we would see . . . with a motor vehicle accident." She also believed Jayden suffered trauma from something other than a simple fall due to the existence of hemorrhaging on both sides of the child's optic nerve and the presence of retinal hemorrhages.[7]

---

[6] A report prepared by Jayden's pediatrician on April 13, 2005 indicated that the child had yet to roll over on her own.

[7] Crisp's medical expert, Dr. Anderson, attempted to rebut Dr. Molina's testimony. Dr. Anderson stated an accidental fall from a changing table, like the one in Crisp's apartment, could have potentially caused Jayden's injuries and death. He further noted that the rescue efforts employed to revive Jayden likely caused some of the injuries observed by Dr. Molina, including the petechial hemorrhages.

Dr. Molina further testified the bruising she observed on Jayden's torso was recent, occurring most likely within six hours of the child's death, and opined that it too was consistent with physical abuse. Dr. Molina specifically stated that Jayden's bruising was consistent with an adult squeezing the child with force or striking the child with or against an instrument, object, or knuckles. Dr. Molina stated these bruises were not caused by CPR due to the location of the injuries and lividity observed on Jayden's backside. Dr. Molina indicated that Jayden's rib injuries were also consistent with physical abuse because it takes a significant amount of force to break an infant's rib. Based on the history given to Dr. Molina, the presence of the petechial hemorrhages,[8] and the blunt force injuries suffered by Jayden, Dr. Molina opined Jayden's death resulted from blunt force trauma to the head as well as possible asphyxia.

According to Dr. Molina, Jayden's death was not instantaneous. Dr. Molina informed the jury that a child would not act normally after having sustained the type of trauma Jayden's autopsy revealed. She explained Jayden's staring off into space, inability to focus her eyes, difficulty breathing, and mechanical arm motion on the day of her death are the types of symptoms one could expect to observe in an infant who has just suffered a traumatic event.

After reviewing the evidence presented, we conclude there is sufficient evidence to support Crisp's conviction for felony murder. The jury heard testimony that Jayden sustained severe injuries while under Crisp's care and that Crisp admittedly hurt Jayden out of frustration when she would not stop crying. The jury further heard medical testimony that an accidental fall

---

[8] Dr. Molina acknowledged during her testimony that many things can cause petechial hemorrhages, including: covering the child's mouth and nose by holding the child's face too closely to the body; and squeezing the child's neck too tightly.

from a changing table could not have produced the injuries observed in Jayden.[9]  Texas courts have frequently upheld convictions for injury to a child and murder when an appellant, like Crisp, has had sole access to the child at the time the child sustains his or her injuries.  *See, e.g., Flores v. State*, 102 S.W.3d 328, 335-36 (Tex. App.—Eastland 2003, pet. ref'd); *Robbins v. State*, 27 S.W.3d 245, 248-49 (Tex. App.—Beaumont 2000), *aff'd*, 88 S.W.3d 256 (Tex. Crim. App. 2002); *Garcia v. State*, 16 S.W.3d 401, 405 (Tex. App.—El Paso 2000, pet. ref'd); *Bryant v. State*, 909 S.W.2d 579, 583 (Tex. App.—Tyler 1995, no pet.); *Butts v. State*, 835 S.W.2d 147, 151 (Tex. App.—Corpus Christi 1992, pet. ref'd).  We therefore hold that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt in this case. Crisp's second issue is overruled.

### JURY CHARGE ERROR

Crisp contends the trial court erred in charging the jury on a theory of guilt allegedly not supported by the evidence.  Specifically, Crisp argues there is no evidence to support the allegation that his asphyxiation of Jayden caused or contributed to the child's death.  We disagree.

When reviewing allegations of charge error, we must first determine whether error actually exists in the charge.  *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).  If error is found, we must then determine whether such error caused sufficient harm to warrant reversal.  *Id.*  The degree of harm required for reversal depends on whether the error was preserved by the appellant.  *Id.*  If the appellant did not properly object at trial, the error requires

---

[9] Although the jury heard Crisp's expert, Dr. Anderson, opine that an accidental fall caused Jayden's injuries and death, the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to afford the witnesses' testimony.  *See Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. (Tex. Crim. App. App. 1981).  The jury apparently disbelieved Dr. Anderson's testimony, and we must defer to the jury's resolution of Anderson's credibility on appeal.  *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (the jury may believe all, some, or none of a witness's testimony).

reversal only if it is so egregious and created such harm that the appellant has not had a fair and impartial trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). When the appellant has timely objected to an improper jury charge, the error requires reversal unless it is harmless. *Id*.

Here, the jury charge reads, in pertinent part, as follows:

[I]f you find from the evidence beyond a reasonable doubt that on or about the 25th day of April, 2005, in Bexar County, Texas, the defendant, Jerry Christopher Crisp, did commit a felony, to wit: injury to a child, and in the course of and in furtherance of the commission, Jerry Christopher Crisp did commit an act clearly dangerous to human life, to wit: by striking Jayden Crisp with an object or objects unknown to the Grand Jury or by striking Jayden Crisp against an object or objects unknown to the Grand Jury or by asphyxiating Jayden Crisp by strangling Jayden Crisp with the hand or arm of Jerry Christopher Crisp or by asphyxiating Jayden Crisp by placing the face of Jayden Crisp against the body of Jerry Christopher Crisp or by asphyxiating Jayden Crisp by a manner and means unknown to the Grand Jury or by any combination of striking Jayden Crisp and asphyxiating Jayden Crisp as described above, and Jayden Crisp was an individual younger than fourteen years of age or younger, thereby causing the death of Jayden Crisp, then you will find the defendant guilty of felony murder.

Crisp concedes on appeal the court's charge accurately reflects the applicable law and enables the jury to consider alternate means by which Crisp could have committed the charged offense.[10] Thus, we must assess whether there is sufficient evidence to support the allegation that Crisp's asphyxiation of Jayden caused or contributed to Jayden's death.

As previously noted, the record reveals Crisp admitted that he squeezed Jayden firmly and held her tightly by the neck on the day of her death. He also admitted to holding Jayden's face up to his body and taking "her breath away for a little while." In addition, the record shows

---

[10] The charge error at issue thus does not involve an alleged misstatement of the law; rather, it involves an alleged error in charging the jury on a theory of guilt not raised by the evidence. *See Griffin v. United States*, 502 U.S. 46, 56-60 (1991) (distinguishing between charge error in which the charge correctly states the law regarding a theory of guilt not supported by legally sufficient evidence and charge error involving legal deficiencies such as misstating the law or applying a statute that violates a constitutional provision); *Guevara v. State*, 191 S.W.3d 203, 205-08 (Tex. App.—San Antonio, 2005, pet. ref'd) (en banc) (distinguishing a charge containing a misleading statement about the law from a charge that correctly states the law but erroneously charges on a theory of guilt not supported by the evidence at trial).

bruising on Jayden's body that was consistent with an adult squeezing the child with force.  Dr. Molina further testified that she observed petechial hemorrhages during Jayden's autopsy and that such hemorrhages may be "associated with asphxial-type deaths."  The record also contains Dr. Molina's testimony about the presence of subconjunctival hemorrhages, which may also constitute a sign of asphyxiation.  Although Jayden did not show any internal neck or larynx injuries, Dr. Molina stated a ten-week-old infant may not show visible signs of asphyxiation because there are multiple ways to strangle an infant that may not cause visible injury to the victim.[11]  Finally, the record includes Dr. Molina's testimony that given the various hemorrhages suffered by Jayden and the circumstances surrounding the child's death, asphyxiation could have caused or contributed to Jayden's demise.  In light of the evidence before the jury, we conclude there is sufficient evidence warranting an instruction on the manner and means of asphyxiation.  Thus, we hold the trial court did not err under the circumstances and overrule Crisp's first issue.

---

[11] Dr. Molina testified "[t]he problem with asphyxia deaths . . . is there's no findings at autopsy," rather "the ruling is based on the circumstances." Dr. Molina explained the importance of circumstances when evaluating a cause of death as follows:

> For those of you who can remember, we used to have these old time refrigerators that opened from the outside only and locked from the inside and people would put them outside when you were done or discard them in junkyards and little kids would play hide-and-seek, which they'd go in and hide in them and then they couldn't get out, and they would die or asphyxiate in the refrigerator.  There's absolutely no finding in autopsy with that.  None whatsoever.  There's no way to diagnose how they died except the circumstances. The same is true in most drownings, the same is true in smothering, if you take a pillow over someone's face.  Unfortunately, we just can't find it.  So, if you take circumstances out of the tool kit, if you will, of the forensic pathologist, all of those deaths would be ruled undetermined because we have no findings.  The circumstances are very, very important to us, and we rule a great deal of causes and manners of death based purely on circumstances.

**DENIAL OF THE OPPORTUNITY TO PRESENT A COMPLETE DEFENSE**

Crisp also argues the trial court deprived him of his constitutional right to a meaningful opportunity to present a complete defense.[12]  Specifically, Crisp alleges the trial court denied him a meaningful opportunity to present a complete defense by placing unreasonable restrictions on his: (1) ability to voir dire the venire panel; (2) cross-examination of the witnesses; (3) ability to call defense witnesses; and (4) closing argument.  We disagree.

**a. Voir dire**

After reviewing the record of Crisp's voir dire, we believe nothing occurred during voir dire that actually affected Crisp's ability to present his defense.  Although the trial court denied Crisp's attorney's voir dire request for the appointment of a second attorney to assist with selecting a jury, the record shows defense counsel nevertheless had the assistance of another attorney (Jason Joyner) and a secretary during voir dire.  To the extent Crisp complains that the trial court's abrupt termination of voir dire harmed his defense, the record does not support his contention.  Voir dire was never ended by any restrictions placed on the litigants by the trial court; rather, voir dire ended when there were a sufficient number of qualified jurors.

**b. Cross-examination**

Crisp complains the trial court violated his constitutional right to present a defense by repeatedly excluding evidence which undermined the prosecution's case and impeached the police investigation.  Crisp identifies numerous instances where the trial court sustained the State's objections to the testimony of several different witnesses.  The record shows that when the State objected in these particular instances, defense counsel made various responsive

---

[12] *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (recognizing the U.S. Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.).  Crisp asserts his third issue implicates his rights under both the state and federal constitutions.  Crisp's state constitutional claim, however, is not supported by separate authority or argument.  *See* TEX. R. APP. P. 38.1(i).  Therefore, we decline to address this complaint on appeal.  *See Heitman v. State*, 815 S.W.2d 681, 690 n. 23 (Tex. Crim. App. 1991).

arguments as to why the particular testimony was admissible. Defense counsel, however, did not argue that the exclusion of the evidence would violate Crisp's constitutional right to present a defense.[13] As a result of Crisp's failure to raise a timely objection, Crisp has failed to preserve his complaint for appellate review. *See Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) (recognizing the deprivation of a meaningful opportunity to present a complete defense is a right subject to forfeiture.).

Even if Crisp had preserved this complaint, we are not persuaded by his contention. Crisp has not established that any of the excluded evidence was vital to his defense. *See Williams v. State*, 273 S.W.3d 200, 232-33 (Tex. Crim. App. 2008). It is evident from the record that Crisp was able to present his version of the events to the jury despite the trial court's rulings.

**c. Defense witness**

Crisp complains the trial court affected his ability to present his defense when it precluded him from calling an expert witness to testify as follows: (1) Crisp was remorseful and distraught over Jayden's death; (2) Crisp had "borderline below average" intelligence and was easily manipulated; and (3) Crisp was immature for his age and made mistakes as a young parent. The State objected to the introduction of such testimony as irrelevant, cumulative, and outside the realm of permissible expert testimony. After furnishing the trial court with a report from his proposed expert, Crisp voluntarily withdrew his expert as a witness. The prosecution then proceeded to present a rebuttal witness and both sides closed.

The record does not show that the trial court prevented Crisp from calling his proposed expert as a witness. Instead, the record demonstrates Crisp withdrew his expert voluntarily. Consequently, we are not persuaded by Crisp's argument.

---

[13] "An objection stating one legal theory may not be used to support a different legal theory on appeal." *Johnson v. State*, 803 S.W.2d 272, 292 (Tex. Crim. App. 1990).

**d. Closing argument**

Lastly, Crisp complains that the trial court affected his ability to present his defense by giving him only forty-five minutes for closing as opposed to the sixty minutes requested by defense counsel. Defense counsel, however, did not complain to the trial court that the amount of time allotted by the court for closing violated Crisp's constitutional right to present a defense. Thus, this complaint is not preserved for our review. *See Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995). Crisp's third issue on appeal is overruled.

CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.

Catherine Stone, Chief Justice

DO NOT PUBLISH